568 So.2d 554 (1990)
STATE of Louisiana
v.
Gary BYRD.
No. 90 KK 0722.
Supreme Court of Louisiana.
October 22, 1990.
*556 William J. Guste, Jr., Atty. Gen., Morgan J. Goudeau, III, Dist. Atty., Donald J. Richard, Asst. Dist. Atty., for State of La.
Susan Theall, Attorney at Law, Ed Lopez, Opelousas, for Gary Byrd.
COLE, Justice.
The issue in this case is whether statements made by minor children during the course of a search based on a valid search warrant are to be suppressed, the statements constituting evidence of criminality not directly within the ambit of the warrant. The warrant authorized a search for materials relating to child pornography. The statements disclose the children are probable victims of sex abuse. The defendant is charged with sexual battery (R.S. 14:43.1).
The trial court granted defendant's pretrial motion to suppress the statements and any in-court testimony derived from the information. The Court of Appeal agreed with the trial court's result. Both courts assumed the search warrant's validity. The defendant now asserts the statements are inadmissible because the search warrant was invalid and also because the statements are outside the ambit of the warrant's purpose.
We find the search warrant to have been properly issued and the statements admissible. We, therefore, reverse the judgment below and remand for further proceedings.

I.
Defendant Gary Jefferson Byrd is a medical doctor specializing in child psychiatry. In April 1986, Lieutenant Timothy Shirley of the Louisiana State Police received a file from the Louisiana Department of Health and Human Resources ("DHHR") regarding an incident involving Byrd's treatment of a juvenile, to whom we shall refer as "Willie." The report contained allegations by the child's mother that Byrd had over-medicated the child while he was in Byrd's care and that the mother was suspicious of the relationship between Byrd and her son. Although one investigator at the DHHR "closed out" the file and wrote a finding of no cause for further investigation, the DHHR forwarded the "Willie File" and evidence of other circumstances of possible abuse to the state police because the jurisdiction of the DHHR is limited to children mistreated by parents or guardians.
Lt. Shirley delivered the file to William Scherer, Jr., of the United States Postal Inspection Service, who then initiated an investigation into Byrd's possible activities in the area of child pornography. In May 1986 Scherer began a "sting" operation by delivering to Byrd a Sexual Preference Matching Questionnaire from Freedom's Choice, a company purportedly dealing with sexually explicit material (but which was actually a cover operation for the Postal Inspection Service). Using the alias Mr. and Mrs. James McIntosh, Byrd responded to the solicitation. He indicated he was interested in receiving photographs and video tapes of pre-teen homosexual and heterosexual activity. He noted on the questionnaire he wished to receive "only merchandise, catelogs [sic] or listings" and did not wish to receive letters or to have personal contacts.
Freedom's Choice responded to Byrd's request, informing him he had been assigned a confidential correspondence number, and he could contact other persons with similar interests by writing to a confidential post office box. Byrd answered this letter, again indicating he wished to have no personal contact with other people but was "interested in receiving listings of VHS videotapes, descriptions of photographs, descriptions or listings of novels or topics of writ[t]en materials related to the topics previously annotated." He noted his *557 interest in ordering selected items was only for educational and research purposes.
Freedom's Choice informed Byrd that because his name (Mr. and Mrs. McIntosh) did not correspond to any entry on their mailing lists, the company had been somewhat slower than usual in responding to his request, adding that "[w]e must, by virtue of the nature of our interests, be extremely cautious in our dealings." The company indicated it was referring his request to another organization which specialized in the type of material he sought.
Byrd next received a flyer from Unique Video Imports of San Juan, Puerto Rico (another company established by the Postal Inspection Service), featuring seven adult pornographic videos for sale. The flyer instructed if Byrd were interested in the "Miniature Erotica Collection," featuring "Lolita" and "Wonderboy Talent," he would be required to request specifically that catalogue. Byrd ordered none of the adult videos, but returned the flyer indicating he was interested in the Miniature Erotica Collection.
The company responded to Byrd's request by sending him a compilation of six videotapes from that collection. Byrd, using his alias, ordered tapes entitled "Carnivale" and "School Days," enclosing two personal money orders for $59.95 each. The catalogue descriptions of the tapes leave no doubt they depicted various sexual acts by and among minor children, ranging in age from 5 to 14 years old. The company contacted Byrd to apologize for the delay in shipping the tapes he had ordered. It advised him they would be arriving soon.
The tapes were delivered to Byrd's address by a postal inspector on July 29, 1987. At the same time, Agent Scherer was securing a search warrant for Byrd's home and adjacent office. A United States Magistrate issued the warrant, and Scherer informed federal officers to execute it. They did so, with the assistance of several local law enforcement personnel, some twenty minutes later.
Among the agents who conducted the search was Sandra Wellman, a criminal investigator with the United States Customs Service. Although she had previous experience with child abuse cases while a detective in Oregon, her assignment during the search of Byrd's office and residence was to "determine whether or not there were any violations of the U.S. Customs Law under 18 U.S.C. § 2252 ... [concerning] the importation or exportation of child pornography materials." During the search at least four children were found on the premises. Wellman was assigned the task of interviewing the two younger children "to determine their knowledge of the pornography items in the house...." It was believed the children were aware of where Byrd was secreting pornographic materials. The children did lead the authorities to several photographs of nude children, including photographs of themselves, in a portion of Byrd's attic used for the storage of files.
Wellman testified at the suppression hearing the two children were interviewed separately and corroborated each other's statements. The children told of spankings administered by Byrd and of Byrd's having fondled the genitals of each while the other was present. The fondling incidents were reported to have occurred many times, nearly every day, since the preceding November. This information was transmitted to state authorities, and the St. Landry Parish Grand Jury returned an indictment against Byrd on two counts of sexual battery, in violation of La.R.S. 14:43.1.
Byrd moved to suppress the statements of the children and to suppress any in-court testimony derived from those statements. He attacked the statements as fruit of an illegal search, on the theory the search warrant was issued on less than probable cause because the "Willie File" (which prompted the initial investigation by the Postal Inspection Service) was not based on fact. The trial court, after conducting extensive hearings on the motion to suppress, took the issue under advisement.

II.
Subsequently, the court granted the motion to suppress. It noted the "general validity of the warrant was assumed." *558 Notwithstanding that general validity, however, the court held:
[t]he statements from the two juveniles were not covered by the warrant, were obviously not in plain view, nor a natural or normal incident of the search authorized by the warrant. In fact, by the federal employee's own testimony, the statements were ferreted from the children. It is difficult to believe that the interrogator of the juveniles was not brought to the search for the hidden purpose of digging out child abuse.
I conclude the statements, plus any in-court testimony derived from them, are suppressible.
The state applied to the court of appeal for supervisory writs. The writs were denied, the court explaining:
[w]e agree with the trial court that the statements should be suppressed but for reasons other than those relied upon by the trial judge. The purpose of the search warrant issued in this case was to seize tangible evidence described in the warrant and did not authorize or empower the officers executing the search warrant to conduct an intensive interrogation of the minor occupants of the premises, without the consent or permission of their legal guardians. In this case, the officers went beyond the lawful scope of the search warrant by interrogating the minor occupants of the premises to be searched for evidence of crimes having no nexus to the crime being investigated. As executed, this warrant became an instrument for conducting a random exploratory investigation. We view the actions of the officers in this case as violative of the constitutional rights of the minors.
The court of appeal did not specify which constitutional rights of the minors were at issue or how the defendant (who is the legal guardian of both juveniles) had standing to use the constitutional violation of a third party as the basis of his suppression motion.
The state then applied for a supervisory writ. We granted the writ in order to review whether the trial court correctly ordered the statements of the children and any derivative in-court testimony suppressed. The state has not briefed the issue of whether the search warrant was validly issued, since both lower courts assumed the warrant was validly issued. However, the defendant does contest the validity of the warrant and contends since the warrant is invalid any statements obtained from the children constitute "fruit of the poisonous tree" and are, thus, inadmissible. In the interest of judicial economy, we consider this issue as well.

III.
Byrd contends the affidavit in support of the warrant is facially valid but is in fact fatally defective because of the untrustworthy information contained therein;[1] the search was not a good faith exception to the exclusionary rule; the search was overly broad; and, the children's statements are clearly the "fruit of the poisonous *559 tree" and should be suppressed. For the reasons set forth below, we disagree.

A.
We have held that "probable cause exists when the facts and circumstances within the affiant's knowledge and of which he has reasonably trustworthy information, are sufficient to support a reasonable belief that an offense has been committed and that evidence or contraband may be found at the place to be searched." State v. Johnson, 408 So.2d 1280, 1283 (La.1982). An issuing magistrate must make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit, there is a "fair probability" that evidence of a crime will be found in a particular place. The task of the reviewing court is simply to insure that the magistrate had a "substantial basis" for concluding that probable cause existed. Illinois v. Gates, 462 U.S. 213, 239-41, 103 S.Ct. 2317, 2322-23, 76 L.Ed.2d 527 (1983); State v. Lingle, 436 So.2d 456, 460 (La. 1983).
Byrd urges the warrant in this case is invalid because of several misstatements in the affidavit. Agent Scherer's search warrant affidavit contains seventeen pages of information[2] to support the finding of probable cause to believe the two tapes Byrd purchased, as well as other evidence of child pornography, were present at the place to be searched. Byrd asserts the affidavit states he was under investigation for "unnecessarily sedating and sexually abusing children" when Agent Scherer had information limited to one allegation involving one child. Byrd further argues the recitation "children he was treating were victims of previous incidents of physical or sexual abuse," was not proven true, and Agent Scherer could not have received this information from the "Willie File" because it contains no such allegation.
These discrepancies are minor at best and could not reasonably be characterized as false statements included by the affiant in the warrant affidavit knowingly and intentionally or with reckless disregard for the truth. See Franks v. Delaware, 438 U.S. 154, 155-56, 98 S.Ct. 2674, 2676, 57 L.Ed.2d 667 (1978). Agent Scherer testified he received not only the "Willie File" from Lt. Shirley, but other verbal information as well. While Byrd maintains Shirley denied giving any other information, the record demonstrates Shirley could not recall informing Scherer of other allegations but did not rule out the possibility. While Byrd contends the "Willie File" did not contain any information concerning the prior sexual and physical abuse of some of Byrd's patients, this fact was independently confirmed by Byrd himself at the suppression hearing. Although it is not clear from whom Scherer received the information, these facts demonstrate he was privy to information not specifically contained in the "Willie File."
The making of material and intentional misrepresentations to a magistrate involves a fraud upon the courts and will result in the invalidation of the warrant and suppression of the items seized. State v. Williams, 448 So.2d 659, 663 (La. 1984); State v. Rey, 351 So.2d 489, 492 (La.1977). If the misrepresentations or omissions are inadvertent or negligent, the warrant will be retested for probable cause after supplying that which had been omitted or striking that which had been misrepresented. Lingle, 436 So.2d at 460-61; State v. Lehnen, 403 So.2d 683, 686 (La.1981).
On the record in this case, we cannot draw the inference that Scherer intentionally misled the issuing magistrate. State v. Lee, 524 So.2d 1176, 1181 (La.1987). A fair reading of the record lends support for the statements made by the affiant. It does appear Byrd was under investigation for sexual abuse of more than one child, and how Scherer obtained this information is important only insofar as he came about it through official sources and believed the information to be true.
Even assuming the statements specified by Byrd were erroneously included in *560 the affidavit, a reading of the entire affidavit, minus the contested statements, clearly supports a finding of probable cause. Scherer's extensive experience in the field of child pornography and pedophilia, his information concerning the incident with "Willie," the extensive correspondence between Byrd and several "companies" set up by the Postal Inspection Service, the ordering of two clearly described pornographic tapes involving the sexual exploitation of juveniles, and the delivery of the two tapes to the residence of the defendant, established to a fair probability evidence of a crime would be found at defendant's home or office. We have no difficulty holding the magistrate had a substantial basis for concluding probable cause existed.
Byrd's contention that the search was not a good faith exception to the exclusionary rule is unavailing. The good faith exception, as set forth in United States v. Leon, 468 U.S. 897, 922-24, 104 S.Ct. 3405, 3420-21, 82 L.Ed.2d 677 (1984), pertains to occasions where law enforcement officers act pursuant to a warrant later found to have been issued without probable cause. Since we have concluded the warrant in this case was validly issued, Byrd's argument is not relevant.
Similarly, Byrd's characterization of the children's statements as being "fruit of the poisonous tree" assumes the tree had suffered infestation from the beginning. Having concluded the warrant was valid, the statements are not derivative evidence unalterably tainted by an illegal search. This argument also fails to provide Byrd a basis for suppression of the statements.

B.
Byrd maintains the search was overly broad in that, while the stated purpose of the search was to find items of child pornography, his medical files were searched, files of locally prominent persons were read and parts removed, bedrooms were searched, and his home was ransacked. A physician's medical bag, condoms locked in a medicine cabinet, multiple vials of prescription medications, and complete litigation files of cases in Texas in which Byrd was a plaintiff were seized. Investigative files on the alleged wrongdoings of the DHHR were invaded and portions taken by the police. Also seized were photographs of Byrd's biological children, of his cats, of Byrd as a child, of his deceased parents, his tax records for several years, a file containing invoices of medication purchases and payments, and his entire child abuse research and text filing cabinet. The medical textbook Show Me and multiple other textbooks were taken. Folders containing correspondence with nationwide child abuse groups and with law enforcement agencies were taken, as was extensive correspondence with church and medical authorities relating to Byrd's request for assistance for children exposed to AIDS in an organized adult sex ring. Byrd contends the seizure of all this and other unspecified evidence was clearly beyond the scope of the warrant. He asserts this flagrant disregard for the terms of the warrant requires total suppression of all evidence seized. The search warrant authorized a search for and seizure of
property relating to the exchange, bartering, swapping, sale, purchase, and duplication of child pornographic materials. This material is believed to include obscene or sexually-explicit videotape recordings, films, photographs, slides, photo-illustrated magazines and books depicting minor children (under the age of eighteen (18)) engaged in various sexual acts and sexually-explicit conduct including lascivious exhibition of the gentials [sic] as defined in Title 18, United States Code, Section 2256 as well as child erotica. Also believed to be concealed therein are various items of equipment used for the production, duplication and viewing of child pornography including cameras, movie projectors, slide projectors, videotape recorder/players, video cameras and monitors. It is further believed that there is being concealed therein records and correspondence relating to the distribution, exchange, bartering, swapping, selling and purchasing of child pornographic materials through the U.S. Mails including letters, documents, papers, *561 writings, envelopes, wrappers, advertisements or mailing lists, diaries, journals, logs, money order receipts and checks.
* * * * * *
It is further believed that there is being concealed therein two video tape recordings titled "Carnivale" and "School Days."
It may be that, in the end, some of the materials seized during the search of the premises would not be relevant or admissible by the prosecution at trial. "Relevancy and admissibility at trial is not the test governing the seizure of things by an officer while executing a search warrant. Rather, the standard is whether the items tend to prove the commission of any offense." State v. Feeback, 414 So.2d 1229, 1232 (La.1982) (emphasis in original). It cannot be concluded at this point, however, that seizure of the specified items exceeded the scope of the warrant. It is at least conceivable all of the specified items have a tendency to prove Byrd was involved in the activities for which the warrant had been sought. As detailed in Scherer's affidavit, those involved in the trafficking of child pornography or who are pedophiles[3] often have substantial collections of pornographic material which is commonly retained or swapped among a network of like-minded individuals. Byrd was suspected, not only of having been a procurer of pornographic videos but as one who had some financial involvement in the area as well. Additionally, the use of drugs, based on Scherer's experience, was deemed a common element among those fitting the psychological profile of a pedophile. Byrd's ready access, as a physician, to drugs, as well as his suspected financial involvement, are legitimate areas of investigative concern, and the seizure of the specified materials did not exceed the scope of the authority of the investigating officers as set forth in the warrant.

IV.
The state argues the trial court and the court of appeal erred in suppressing the statements of the children obtained during the course of the search. It maintains questioning, or even interrogating, non-suspect individuals during a warranted search does not constitute a seizure within the meaning of either U.S. Const. amend. IV or La. Const. art. I, § 5. It contends, under the Fourth Amendment, a person has a right to suppress evidence obtained as the result of an illegal search or seizure only if the search or seizure violated that person's own rights, not the rights of some third person, citing State v. Owen, 453 So.2d 1202, 1205 (La.1984). The question, it maintains, is whether La. Const. art. I, § 5 protects a defendant from the utterances of third persons made during questioning of those third persons at the place of, and during the course of, a warranted search. Neither the trial court nor the court of appeal found the children had been seized or improperly detained. The state maintains because the reason for suppressing the statements was couched as a violation of privacy rights, the courts made no finding of the necessary predicate, that is to say a seizure, either of a person or of a thing, had taken place. The state, noting the courts' failure to cite constitutional or statutory authority for their conclusions, maintains such a ruling was not made because it was not legally or factually possible to do so.
Byrd counters by arguing the detention and questioning of the minor children should be considered a seizure and the detention unjustified, citing the Supreme Court's decision in Michigan v. Summers, 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981). Byrd also contends since the Louisiana Constitution grants a greater privacy right as well as third-party standing, and since the children had been illegally seized, and since he would be adversely affected by the admission of the children's statements against him, the statements were properly excluded. He contends he had a reasonable expectation of privacy with respect to the children under his care. Specifically, he asserts it is reasonable to expect the state will not be allowed to coerce *562 statements from six and eight year old boys. The questioning of the boys, he maintains, cannot be justified as a normal incident of the search.
It is clear that rights under the Fourth Amendment are personal in nature. As such, they may be enforced by exclusion of evidence only at the instance of a person whose own protection was infringed by the search or seizure. Rakas v. Illinois, 439 U.S. 128, 138, 99 S.Ct. 421, 428, 58 L.Ed.2d 387 (1978); State v. Owen, supra. Byrd cannot assert the childrens' Fourth Amendment rights, and he has made no showing Fourth Amendment rights personal to him were infringed by the officer's questioning of the two boys.
Under Article I, § 5 of the Louisiana Constitution, "Any person adversely affected by a search or seizure conducted in violation of this Section shall have standing to raise its illegality in the appropriate court." Byrd, therefore, has standing to raise the illegality of the search or seizure under the state constitution. That he may raise the issue is, of course, not determinative of the legality, vel non, of the search or seizure. We have previously concluded the search warrant was validly issued and executed. Thus, the officers had lawfully gained access to the premises and were engaged in the lawful search for the items they were empowered to seize. The two children were at no time searched, and Byrd does not contend they were. Rather, Byrd's contention is that the children were unlawfully detained, the detention should be deemed a seizure, and any statements obtained as a result of that unlawful seizure should be suppressed. Also, he contends he had a legitimate expectation that the children in his care would not be coerced and the interrogation of the children is an invasion of their privacy and of his own.
Byrd's reliance on Michigan v. Summers, supra, is misplaced. The defendant in Summers had left the house he owned and was outside when he was forced by the police to reenter the residence and to remain there while the search was conducted. He was then, himself, searched by the officers and arrested. Despite the fact it reversed the suppression order, the Court recognized the initial detention of Summers was a seizure within the meaning of the Fourth Amendment. The record in this case reflects the children were already in the house, had not attempted to leave, and were not in the position of being compelled to return to the house after they had departed. The two children, according to the testimony at the suppression hearing, were singled out because they refused to stay in the living room and continually "got underfoot" in their attempt to assist the authorities. It is undisputed the questioning of the children began as an attempt to discover whether the children were aware of any pornography in the residence. The children did lead the officers to some pictures of naked juveniles, and, in the process of questioning, revealed they were the victims of sexual battery.
The search did not evolve into a general search which intruded on Byrd's privacy rights. The questions posed to the children found on the premises were asked in an effort to discover evidence specifically listed in the warrant; that such questions elicited evidence of other crimes, regardless of the knowledge of the officers as to this evidence, does not automatically preclude its subsequent use against Byrd. See Horton v. California, 495 U.S. ___, ___, 110 S.Ct. 2301, 2309, 110 L.Ed.2d 112 (1990).
As the children were not unlawfully detained, their statements are not the product of an unlawful seizure. It is as the result of an initial unlawful search or seizure that verbal evidence has been occasionally excluded as tainted derivative evidence, not because of any notion that the statements themselves were somehow "seized." E.g., United States v. Ceccolini, 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978); Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).
Byrd does not argue that the children's rights under either the Fifth or Sixth Amendment or La. Const. art. I, § 16 were violated by the questioning. Such an argument *563 would fail. We have held a third-party defendant does not have standing to contest the use of information gathered from a juvenile suspect. State v. Singleton, 376 So.2d 143, 145 (La.1979). More generally, "a person adversely affected by a confession unlawfully obtained from another has no standing to raise its illegality in court." State v. Burdgess, 434 So.2d 1062, 1064 (La.1983).
Apart from the standing issue, the children were not suspects, targets, or accomplices, but, rather, were victims relating information relevant to the crimes which had been committed. As such, they need not have been administered Miranda warnings. We have held that before any statements given by juveniles can be used, it must be affirmatively shown that the "juvenile engaged in a meaningful consultation with an attorney or an informed parent, guardian, or other adult interested in his welfare before he waived his right to counsel and privilege against self-incrimination[,]" State in the Interest of Dino, 359 So.2d 586, 594 (La.), cert. denied, 439 U.S. 1047, 99 S.Ct. 722, 58 L.Ed.2d 706 (1978). However, that holding has never been extended to conversations with juveniles who may be victims of a crime. The rationale of Dino is to protect a youth from his own inexperience and lack of understanding in dealing with the police as a suspect in a crime, not to protect defendants who have chosen juveniles as victims.
The law enforcement officers in this case, executing a lawfully issued warrant, were free to chat with and to question persons who were not suspects and who were on the premises of the search as to their knowledge of the whereabouts of any of the items enumerated in the warrant. Before doing so, the officers were required neither to Mirandize those who were not suspects nor to obtain an additional warrant before initiating a conversation with them. Contrary to Byrd's assertion, no adult was required to be present when the police questioned the boys; no right of theirs was violated and no right of his, either personal or derivative, was violated. Accordingly, the trial court erred in granting the motion to suppress. Its judgment is reversed and the case is remanded for trial.
REVERSED AND REMANDED.
CALOGERO, C.J., concurs.
DENNIS, J., concurs in part and dissents in part with reasons to be assigned.
NOTES
[1] Byrd also contends this Court should "vitiate probable cause" because the "facts and circumstances detailed in the affidavit arose because of entrapment." He alleges Scherer's affidavit, his investigation, and his testimony at the suppression hearing reveal no predisposition on Byrd's part to order child pornography.

Entrapment is a defense which arises when a law enforcement official originates the idea of the crime and then induces another person to engage in conduct constituting the crime, when the other person is not otherwise disposed to do so. State v. Brand, 520 So.2d 114, 117 (La.1988) (further citation omitted). Entrapment is an affirmative defense, i.e., one which, rather than negating an essential element of the crime, presents exculpatory circumstances that defeat culpability in spite of the fact the prosecutor has proved all of the essential elements beyond a reasonable doubt. Id. and id. at n. 5 (citing State v. Cheatwood, 458 So.2d 907 (La.1984)) (further citations omitted).
The question whether a government agent implanted the criminal idea in the mind of an innocent person to induce the commission of a crime that would not otherwise be committed is one for the jury. The defendant asserting the entrapment defense must prove it by a preponderance of the evidence. Brand, supra (citing Sorrells v. United States, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932)). We are therefore not in a position to decide, as a matter of law, whether Byrd was entrapped, and we decline to do so. This negates our consideration of whether entrapment undermines the magistrate's determination of probable cause.
[2] The affidavit includes a summary of his sixteen years experience in the field and a detailed rendition of the correspondence between Byrd and the Postal Inspection Service.
[3] The former may be a subset of the latter.