b MURRAY, Judge.
Defendant Ronald Brooks appeals his conviction and sentence for second-degree murder. We affirm.
STATEMENT OF THE CASE:
Ronald Brooks was charged by grand jury indictment on July 3, 1997 with second degree murder. He pled not guilty. In a pre-trial motion, defense counsel moved to have evidence seized from Mr. Brook’s home suppressed alleging that the search warrant was defective. Following a hearing, the trial court denied the motion. Mr. Brooks initially was tried on September 15, 1997. A mistrial was declared after the jury declared it was unable to reach a verdict. Following a second trial on October 30, 1997, a twelve-person jury found Mr. Brooks guilty as charged. He subsequently was sentenced to life imprisonment at hard labor, without benefit of probation, parole, or suspension of sentence. The trial court denied a motion to reconsider sentence, and granted the motion for appeal.
In his sole assignment of error, Mr. Brooks alleges that the trial court erred in failing to suppress evidence seized pursuant to an allegedly defective search warrant.
I «FACTS:
James Moses Sterling testified that he had known Ronald Brooks since the third grade, and had known the victim, Stephen Dillon, for about twelve years. Mr. Sterling said he got off work on April 29, 1997, and stopped by a neighborhood grocery store on the corner of Mazant and Derbig-ny Streets, intending to pay Mr. Dillon twenty dollars he owed him. He did not see Mr. Dillon, but saw his car, a black Ford Probe, and asked another friend to tell the victim he would be back to pay him the twenty dollars. Mr. Sterling went home, around the corner from the grocery store. As he was preparing something to eat, he heard five shots, took some food out of a microwave oven, then turned to look out of the kitchen window. He saw *131 Mr. Brooks run alongside of his residence and jump a fence. Mr. Sterling said that Mr. Brooks was holding his waist when he jumped the fence, and a black revolver fell out of his waistband. Having witnessed a fight between Mr. Brooks and the victim two weeks earlier, Mr. Sterling ran out of his house and went around the corner to the store to look for Mr. Dillon. Mr. Sterling testified that he spoke to police officers that night and described what Mr. Brooks was wearing - black jeans and a white tee shirt.
The State questioned Mr. Sterling about a possession of crack cocaine charge pending against him, and the witness denied being promised anything by the State in exchange for his testimony. On cross-examination, Mr. Sterling admitted that he had prior convictions for aggravated battery, simple battery, and possession with intent to distribute marijuana.
Carl Odoms testified that, shortly before the shooting, he was loitering with the victim behind the corner grocery store when the owner told them to move. The victim borrowed some change from Mr. Odoms for a drink, and entered the store. DAs Mr. Odoms walked away, he saw Mr. Brooks, whom he said he had known for about one year, get off a bus at the corner by the grocery store. Mr. Brooks shook Mr. Odoms’ hand as they passed each other. Mr. Odoms said he walked across the street, stopped to greet someone, and as he turned around, saw Mr. Brooks approach the victim from behind, and pull a gun out of his pocket. The victim turned around and said, “Don’t do that.” Mr. Brooks fired, and the victim tried to block the bullet. However, Mr. Brooks kept shooting, and shot the victim again as he fell. Mr. Odoms said Mr. Brooks then ran and jumped over a gate. Mr. Odoms subsequently saw Moses Sterling running up the street saying he had heard the shots and had seen Mr. Brooks running through his gate. Mr. Odoms knew about the prior fight between Mr. Brooks and the victim.
Mr. Odoms admitted on cross-examination that he had two prior convictions for possession of marijuana. He also admitted that he left the scene before police arrived, and did not go to the police with his story until sometime after the victim’s funeral. He explained that after attending the funeral and seeing how upset the victim’s family was, he believed it was the right thing to do.
New Orleans Police Officer Gregory Robinson testified that, on April 29, 1997, at around 5:45 p.m., he responded to a shooting near the corner of North Derbig-ny and Mazant streets. Upon arrival at the scene, he found a black male with several gunshot wounds lying alongside a vehicle. Officer Robinson stated that he did not remember whether or not he put down on his report the name of the person who committed the crime. He also said he did not arrest anyone in connection with the crime. Officer Robinson stated on cross-examination that he recovered a purple plastic bag containing what he believed to be marijuana from the victim’s shirt pocket. He testified that someone at the scene told him that the | ¿suspect was a black male. Defense counsel pointed out that at the first trial, the witness had said that he “confiscated” a witness at the scene and took her to the 5th District station, where she gave a statement. Officer Robinson stated that he was mistaken, and had this case confused with another.
New Orleans Police Detective Herman Cade testified that on April 29, 1997, he assisted Detective Walter Gifford in the investigation of a homicide on Derbigny Street. He located two witnesses at the scene, a Mr. Sterling and Leona Fisher. He interviewed Mr. Sterling at the station, where he identified Mr. Brooks as the perpetrator, and said Mr. Brooks had been wearing a white tee shirt and black jeans. Det. Cade did not interview Ms. Fisher.
New Orleans Detective John Riviere testified that he took a statement at the police station from Leona Fisher, a witness, on the night of the murder. Based *132 on her statement, and statements of other witnesses, officers obtained an arrest warrant for Mr. Brooks and a search warrant for 1330 Mazant, where it was believed he lived. However, when the warrants were served, Mr. Brooks’ mother said he did not live there. Based on a subsequent anonymous telephone call informing them of a different location for Mr. Brooks, police obtained a second search warrant for 2031 Desire Street, upper apartment. That warrant was served on Merlin McCurdy, who lived at that address, and who informed police that Mr. Brooks rented a room in his apartment. Police searched that room and recovered a pair of black Girbaud-type jeans and some papers with Mr. Brooks’ name on them. They also recovered a shirt from the yard of the residence next door. Det. Riviere said Mr. Brooks later turned himself in to police. On cross-examination, Det. Riviere admitted that no firearms, Nike caps, or bandannas were found during the search. However, he stated that the jeans and tee shirt recovered were in plain | ¡¡view.
New Orleans Police Detective Walter Gifford was the primary investigator of the homicide. He said he found no empty cartridge casings on the scene, and explained that when a revolver is fired the casings remain in the gun unless someone opens the gun and takes them out. Det. Gifford testified that based on information other officers received at the scene from witnesses, they secured an arrest warrant for Ronald Brooks. Det. Gifford was also one of the officers who executed the search warrant at 2031 Desire Street. The clothing located during the search matched the clothing witnesses said the shooter was wearing, and personal papers of Mr. Brooks.
Det. Gifford ordered laboratory testing of the black jeans and white tee shirt found in Mr. Brooks’ room and of the white tee shirt found in the yard. There was no gunpowder residue or blood on the clothes found inside, but there was type 0 blood on the shirt found in the yard, the same blood type as the victim. He also ordered DNA testing on the blood and hair and fiber analysis, but the tests were never completed because he was transferred to another district, and no one followed up on the tests.
Merlin McCurdy testified that on April 29, 1997, at either 2:00 or 3:00 p.m., Mr. Brooks came into his apartment with a friend. He explained that Mr. Brooks had been renting a room in his apartment from him and his wife for about three weeks. He remembered that Mr. Brooks was wearing black pants and a white shirt, and that the two men had a white towel, which he noticed contained a black revolver. Mr. McCurdy saw Mr. Brooks again around 10:30 p.m. on the night of the murder, and he still was wearing black pants and a tee shirt. Mr. McCurdy testified on cross-examination that he was visiting with his neighbor that evening, | fiwho he later learned was the victim’s cousin. The cousin received a telephone call informing her of the murder, and she related to Mr. McCurdy that someone with whom the victim had been in a fight had murdered him. Mr. McCurdy said he knew that Mr. Brooks had been in a fight with someone about two weeks before the murder, and talked to Mr. Brooks’ brother, Roland, about the incident. Mr. McCurdy assumed that Roland spoke to Mr. Brooks about the rumor, and when he saw Mr. Brooks about 10:30 that evening, Mr. Brooks acted surprised about the rumor and wanted to talk to the cousin.
Dr. William Newman, III, was qualified by stipulation as an expert in the field of forensic pathology. Dr. Newman, who is employed by the Orleans Parish Coroner’s Office, testified that he reviewed the autopsy protocol prepared by Dr. Difatta from an April 30, 1997 autopsy performed on Stephen Dillon. Dr. Newman stated that Mr. Dillon died from a gunshot wound to the back which entered five inches above the left hip and traveled upward, perforating the left lung, the aorta, the right lung, and lodging in the shoulder. *133 He also said the victim had two defensive-type gunshot wounds, one to his right hand, and one to his left forearm. Blood and bile tests from the victim revealed no sign of alcohol, illegal drugs, or commonly used drugs. On cross-examination, Dr. Newman stated that the evidence indicated that the gunshots were fired from at least three feet away.
New Orleans Police Officer Joseph Tafa-ro was qualified by stipulation as an expert in the testing and identification of blood and gunpowder residue. Officer Tafaro stated that he tested a white “Reebock” tee shirt and a pair of black jeans seized from 2031 Desire Street, and found no evidence of blood or gunpowder residue. He also tested the white “Jockey” tee shirt found by police in the yard next door to where Mr. Brooks lived, and found traces of 0 positive blood on it. |7The officer also found traces of 0 positive blood on the clothing worn by the victim, although he did not know it was the victim’s clothing when he examined it.

ASSIGNMENT OF ERROR

Mr. Brooks claims that the trial court erred in denying his motion to suppress the evidence, arguing that the search warrant was defective because it failed to demonstrate a connection between him and the clothing seized.
This Court set out the applicable law pertaining to the issuance of search warrants in State v. Martin, 97-2904 (La.App. 4 Cir. 2/24/99), 730 So.2d 1029, as follows:
La.C.Cr.P. article 162 provides that a search warrant may be issued “only upon probable cause established to the satisfaction of the judge, by the affidavit of a credible person, reciting facts establishing the cause for the issuance of the warrant.” The Louisiana Supreme Court has held that probable cause exists when the facts and circumstances within the affiant’s knowledge, and those of which he has reasonably trustworthy information, are sufficient to support a reasonable belief that evidence or contraband may be found at the place to be searched. State v. Duncan, 420 So.2d 1105 (La.1982). The facts which form the basis for probable cause to issue a search warrant must be contained “within the four corners” of the affidavit. Id. A magistrate must be given enough information to make an independent judgment that probable cause exists for the issuance of the warrant. State v. Manso, 449 So.2d 480 (La.1984), cert. denied Manso v. Louisiana, 469 U.S. 835, 105 S.Ct. 129, 83 L.Ed.2d 70 (1984). The determination of probable cause involves probabilities of human behavior as understood by persons trained in law enforcement. State v. Hernandez, 513 So.2d 312 (La.App. 4 Cir.1987), writ denied, 516 So.2d 130 (La.1987).
In its review of a magistrate’s finding of probable cause, the reviewing court must determine whether the “totality of circumstances” set forth in the affidavit is sufficient to allow the magistrate to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the “veracity” and “basis of knowledge” of persons supplying hearsay information, there is a reasonable probability that contraband ... will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a “substantial basis for ... concluding] that probable cause existed.” Illinois v. Gates, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983).
| «97-2904 at pp. 4-5, 730 So.2d at 1031-32.
In the instant case, Det. Riviere stated in the search warrant application that he desired a search warrant for 2031 Desire Street, upper apartment:
FOR the purpose of seizing the following described property:
Any and all firearms, it’s [sic] instru-mentalities, firearms bills of sale, firearm owner’s manuel [sic] and firearm packaging. Also one man’s white T- *134 shirt and black long pants and a Nike baseball cap, dark in color.
THE reasons and facts for the request of this search warrant are:
See continuation sheets ...
The continuation sheet formed the second page of the application, and stated:
On Wednesday, April 30, 1997, Detective John Riviere, assigned to the Fifth District Investigations Section reports receiving information from a concern [sic] citizen regarding the whereabouts of Ronald Brooks, wanted in connection with the murder of Stephen Dillon, on April 29th, 1997. According to the caller, Ronald Brooks was staying at 2031 Desire Street, upper apartment. The caller further stated that the residence is above a laundromat and the residence is the center door. The caller stated that in order to enter the apartment, you have to go up a flight of steps on the right side of the building.
Detectives checked the last time Brooks was arrested on April 24th, 1997, and learned Brooks was released on a personal surety bond signed by Mr. Merlin McCurdy, residing at 2031 Desire Street.
Based on the detectives [sic] past experience it is their belief that [sic] firearm and it’s [sic] instrumentalities are contained in one’s [sic] residence along with clothing.
Based on the above facts and circumstances it is prayed upon the court that a search warrant be granted for 2031 Desire Street, upper center apartment.
Thus, the search warrant application particularly described the place to be searched, and linked the place to be searched with a person wanted in connection with the murder of Stephen Dillon. The application also particularly described the things to be seized. Missing from the application is any information from which [9the magistrate could determine that the clothing sought was evidence. The trial court noted that the application should have stated that a witness described the clothing sought as having been worn by the assailant when he committed the murder. Officer Riviere testified at the motion hearing that the clothing listed in the application matched the description of what the perpetrator was wearing. Had this information been included in the application for the search warrant, it would have connected Mr. Brooks to the crime.
The determination of whether probable cause to issue a search warrant exists is ordinarily limited to consideration of information contained within the four corners of the application. Martin, supra. However, where, through inadvertence or negligence, there are material misrepresentations or omissions to a search warrant application, the proper procedure is to supply that which had been omitted or strike that which had been misrepresented, and retest the application for probable cause. State v. Byrd, 568 So.2d 554, 559 (La.1990); State v. Smith, 95-1787, p. 5 (La.App. 4 Cir. 10/26/95), 663 So.2d 845, 848.
In the instant case, it is apparent that through inadvertence or negligence Det. Riviere failed to include information in the warrant application that connected Mr. Brooks to the clothing sought. Supplying the additional information related by Officer Riviere at the motion hearing, the search warrant application establishes probable cause to believe that particularly described evidence, the clothing, connecting Mr. Brooks to the murder of Stephen Dillon, could be found at 2031 Desire Street, upper apartment. Therefore, after presumably taking note of Det. Riviere’s testimony at the hearing, the trial court correctly denied the motion to suppress the evidence.
Further, the police were entitled to rely in good faith on the search warrant | missued by the magistrate, under the general assumption that “an officer cannot be expected to question the magistrate’s probable-cause determination or his judgment that the form of the warrant is tech *135 nically sufficient.” State v. Varnado, 95-3127, p. 3 (La.5/31/96), 675 So.2d 268, 270, quoting United States v. Leon, 468 U.S. 897, 921, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). In Vamado, police arrested defendant, who was suspected in a series of rapes, pursuant to an arrest warrant. After his arrest, defendant told police where he lived. Police obtained a search warrant based on an application setting forth the details of the crime and the address of the residence to be searched, particularly describing the exterior of the residence, and identifying several items connected with the offense. However, similar to the instant case, the application failed to provide any specific factual basis linking those items to the residence. In ultimately determining that the officers secured and served the search warrant in good faith, the court noted:
In many cases, the nature of the crime may make it appropriate to assume that the fruits and instrumentalities of the offense are probably stored in the suspect’s residence. See State v. Poree, 406 So.2d 546, 547-48 (La.1981) (“The items sought — a handgun, clothing, money, and a money bag — are objects which one might expect to find at a person’s residence.”); State v. Guidry, 388 So.2d 797, 800 n. 1 (La.1980) (“Although the property in this case could have been stored elsewhere, it was reasonable to assume that the normal place a criminal dealing in stolen jewelry would keep such items [is] at his house.”); see also 2 Wayne L. LaFave, Search and Seizure, § 3.7(d) at 384 (3d ed. 1996) (“Where the object of the search is a weapon used in the crime or clothing worn at the time of the crime, the inference that items are at the offender’s residence is especially compelling....”)
95-3127 at pp. 2-3, 675 So.2d at 270.[1]
In the instant case, Det. Riviere knew that the clothing listed in the search warrant application was clothing described by witnesses as having been worn by In Mr. Brooks at the time of the commission of the crime, and at the time he fled the scene of the crime. Det. Riviere acted in good faith in submitting the search warrant application to the magistrate, who determined that it set forth probable cause to issue the warrant. Likewise, Det. Rivi-ere and other officers acted in good faith in serving the search warrant, knowing they were looking for particularly described clothing in Mr. Brooks’ room, which he had allegedly been wearing at the time of the murder. Accordingly, the trial court was correct in denying the motion to suppress the evidence under Leon’s good faith exception.

ERRORS PATENT

A review of the record reveals no errors patent.[2]
Thus, for the foregoing reasons, Mr. Brooks’ conviction and sentence are affirmed.
AFFIRMED.

. In upholding the search, the Supreme Court reversed this Court’s affirmation of the trial court’s grant of the defendant’s motion to suppress the evidence seized pursuant to the warrant. State v. Varnado, unpub. (La.App. 4 Cir. 11/30/95).

. Mr. Brooks claims that the trial court’s failure to give him credit for time served, and to inform him of the three-year peremptive period for filing an application for post-conviction relief are errors patent. La.Code Crim. Proc. art. 880 provides that a defendant shall receive credit for time served prior to imposition of sentence. There is no provision that the trial court must make this pronouncement. Further, the Department of Corrections commitment form provides that the sentence shall be with credit for time served. As to his claim that failure to inform him of the peremptive period for filing an application for post-conviction relief is an error patent, this Court has held that this is not an error patent. State v. Jones, 97-2217, p. 3, n. 1 (La.App. 4 Cir. 2/24/99), 731 So.2d 389, 392, n. 1.