Melinda HOLMES, Plaintiff–Appellant,

v.

Steven C. KUCYNDA, Marty David Rolfe, James C. Bullock, Jason W. Poole, Cobb County, a Political Subdivision of the State of Georgia, Defendants–Appellees.

No. 02–11408.

United States Court of Appeals, Eleventh Circuit.

Feb. 13, 2003.

is unnecessary. *See* Fed. R.App. P. 34(a)(2).

James Anthony Eidson, Timothy Robert Brennan, Eidson & Associates, P.C., Atlanta, GA, for Plaintiff–Appellant.

Hugh William Rowling, Jr., Sr. Associate County Atty., Marietta, GA, for Defendants–Appellees.

Before ANDERSON, BIRCH and BARKETT, Circuit Judges.

BARKETT, Circuit Judge:

Melinda Holmes appeals an adverse summary judgment granted on the basis of qualified immunity to defendants Cobb County Police Officers Steven C. Kucynda, Marty D. Rolfe, James C. Bullock, and Jason W. Poole ("the Officers"). Holmes filed suit pursuant to 42 U.S.C. § 1983 claiming that the defendants violated her constitutional rights under the Fourth Amendment to be free from unreasonable searches and seizures. Holmes also appeals an adverse summary judgment granted to defendant Cobb County ("the County") on her claim that the County maintained a policy of inadequately training its police officers, especially with regard to warrantless entries, searches, and arrests.

We affirm the summary judgment on behalf of the County. We affirm that portion of the summary judgment that grants qualified immunity to the officers on Holmes' claim that they entered the apartment she was in without consent. However, in view of factual disputes in the record, we vacate and reverse the remainder of the summary judgment granted to the officers.

## BACKGROUND

In deciding whether the district court erred in granting summary judgment, we must consider all of the evidence in the light most favorable to Holmes, as the nonmoving party, and resolve all issues of material fact in her favor. *See Lee v. Ferraro*, 284 F.3d 1188, 1190 (11th Cir. 2002). Viewed in this light, the record reveals the following:

In the early morning hours of November 2, 1998, Officer Rolfe was dispatched to the Post Woods Apartments in Atlanta, Geor-

gia on a "possible signal 86" which denotes activities ranging from a simple argument to domestic violence. Rolfe responded to the call along with his partner Kucynda. Soon thereafter, Bullock and Poole joined Rolfe and Kucynda at the three-story apartment building from which the call had been placed.[1] The complainant who placed the 911 call could not definitively state if the disturbance occurred in the apartment above or below her own second floor apartment. The Officers then separated and began to knock on doors to determine if there had been a disturbance. While Bullock and Poole remained on the second floor, Rolfe went to the floor above the 911 caller and Kucynda went to the one below. Kucynda testified that when he approached the door of Wayne Wisong's apartment, he heard an argument emanating from within.[2] Kucynda notified the other Officers that he had located the disturbance and, as a group, they approached the apartment and knocked on the door.

Prior to the Officers' arrival, Holmes and Wisong had been arguing in the living room of the apartment. However, Holmes asserted in her deposition that the argument was not loud enough for anyone outside the apartment to hear. Holmes also testified that when the Officers knocked on the door the argument had been over for at least five minutes and the couple had already retired for the evening. When the Officers arrived, both Holmes and Wisong were undressed and in bed, but not yet asleep. After they heard the knock on the door, Wisong put on a pair of shorts and a shirt and went to answer the door while Holmes went across the hall to the bathroom to secure a robe.

Wisong answered the door and Rolfe asked him what was going on in the apartment. Wisong responded that he and his girlfriend (Holmes) had been arguing. Rolfe then asked Wisong if the Officers could enter his apartment. The Officers testified that although Wisong did not respond verbally, he opened the door and took a step backwards, indicating acquiescence. All four Officers then entered the apartment. From the bathroom, Holmes heard one of the Officers say, "stand back." Wisong informed Holmes that the police were at the door and, a few minutes later, requested that she come to the entryway because the police wanted to see her. Holmes responded that she would do so as soon as she was dressed.

Because Holmes had discovered that her robe was not in the bathroom, she dashed, still nude, across the hallway into the main bedroom to find it. At this juncture, she saw Kucynda rush down the hall toward her and follow her into the bedroom where Holmes quickly located the robe in one of her suitcases and put it on.[3]

Kucynda entered the bedroom and told Holmes to sit on the bed. After Holmes complied, Kucynda asked her what had transpired between herself and Wisong. She asked what he was doing in the apartment. Kucynda responded by asking

---

1. Bullock was the senior officer at the scene and was training Poole.

2. Of the four Officers, only Kucynda testified that he heard an argument coming from Wisong's apartment. Kucynda further testified that he could not recall if the argument was loud enough for him to distinguish any of the words spoken between Holmes and Wisong.

3. In his deposition, Officer Kucynda stated that as he initially crossed the threshold into the apartment he observed an individual running from the hallway to another room. However, the floor plan of Wisong's apartment precludes this possibility, as no line of sight existed between the entryway and the hallway between the master bedroom and the bathroom. Therefore, Kucynda could only have observed Holmes if he had already moved beyond the entryway into the hall.

Holmes if she and Wisong were having a fight, and she answered that they had had an argument earlier. Kucynda asked if she had been beaten, to which she replied "absolutely not." Kucynda then requested that Holmes describe the content of the argument. When Holmes refused to reveal the personal nature of the argument, he demanded that she do so and she reluctantly complied, explaining that earlier in the evening she and Wisong had been viewing pictures of a previous trip together and Wisong had mentioned that she looked thinner in the pictures than she did that night. Holmes explained to Kucynda that this comment had upset her and, eventually, an argument ensued. At some point during Kucynda's interrogation Holmes began to cry for a brief time.[4]

Kucynda then asked Holmes her name, date of birth, and place of residence. Holmes answered these questions and informed Kucynda that she did not reside in the apartment, but rather in Norcross, Georgia, and was only visiting Wisong. Holmes' suitcase and duffle bag were in the bedroom, and her clothes were in and around the suitcase, including four dresses in the closet.[5] At this point, Holmes attempted to leave the bedroom and Kucynda ordered her to sit back down on the bed.

While Kucynda was interrogating Holmes, Bullock entered the bedroom and asked Holmes if she would consent to a search of the bedroom. Holmes replied that she would not.[6] Nonetheless, Bullock searched the bedroom, but did not locate any contraband, and left the room.

Soon thereafter, Kucynda leaned out the bedroom door to talk with the other Officers. When he stepped back into the bedroom, Kucynda ordered Holmes to get dressed and she was compelled to do so in his presence. Kucynda then escorted Holmes to the living room where she was asked to produce identification. She told the Officers she had a driver's license in her wallet which was in her purse on the living room table. The Officers retrieved the license, which confirmed that she lived in Norcross, Georgia. They then returned the wallet to the purse and the purse to the table.

During the time Kucynda had been interrogating Holmes, Rolfe had been questioning Wisong. Wisong, like Holmes, indicated that the argument had been nonviolent. Rolfe next requested Wisong's identification. Wisong told the Officers that he would have to locate his wallet in the apartment, as he did not have identification in the clothes he had thrown on to answer the door. When Wisong walked to the apartment's second bedroom, which was furnished as an office, Rolfe, Bullock, and Poole followed him. While searching for his identification, Wisong opened a drawer in the desk, and Bullock and Rolfe testified that they observed a clear plastic bag containing a white powdery substance that they presumed was cocaine. When they confiscated the clear bag they also saw a yellow manila envelope, which they opened and found to contain marijuana. At this point the Officers placed Wisong under arrest and took him back to the living room.

---

4. Holmes stated in her deposition that she cried because a police officer had entered her bedroom while she was naked and began questioning her, not because of the earlier argument with Wisong.

5. Also notable is the fact that Holmes' toiletries were found in a travel bag, rather than in particularized locations around the bathroom.

6. Bullock maintains that Holmes granted him permission to search the bedroom.

Also in the living room, Rolfe placed Holmes under arrest, handcuffed her, and asked Wisong for permission to search the apartment. Wisong declined. Rolfe then transported Holmes and Wisong to the Cobb County Adult Detention Center. Officers Bullock and Poole remained in the apartment in anticipation of performing a more complete search upon obtaining a warrant. However, Rolfe was unable to obtain a search warrant, so Bullock and Poole exited the apartment and locked the door.

After booking Wisong and Holmes, Rolfe went to the Cobb County Superior Court and presented Magistrate Judge McLendon with a warrant application for the arrest of Holmes and Wisong. All of the Officers testified in their depositions that the bag of white powder and the yellow manila envelope containing the marijuana had been found in the office/den of the apartment—not in the bedroom where Wisong and Holmes were sleeping—and that no other drugs were found in the apartment. Moreover, the deposition testimony of the Officers relating their conversations with Holmes indicate that the only time she did not readily answer their questions was when Kucynda insisted that Holmes tell him the nature of her argument with Wisong, which was personal and embarrassing to her, but which she revealed upon his insistence. Nonetheless, in contrast to what the Officers had actually observed, the application for Holmes' arrest warrant reflected that "both [Wisong & Holmes] sleep in bedroom with drugs"; that there were "marijuana seeds in plain view"; that presumably Rolfe, as the applicant, "believed custody was joint"; and that Holmes was "evasive as to presence of others." Based upon this application, Magistrate McLendon granted the arrest warrant.

After securing their release from jail upon posting bail, at approximately 10:00 a.m. on November 2, 1998, Holmes and Wisong returned to the apartment. There they found Holmes' purse, which had been upright on the table when they left, on the floor with its contents scattered.

On December 1, 1998, Cobb County Magistrate Judge T.O. Sturdivant conducted a probable cause hearing and dismissed the charges against Holmes when Wisong's attorney stipulated that the desk and bedroom where the drugs were located belonged solely to Wisong. However, when Wisong's attorney subsequently withdrew all stipulations, Holmes was rearrested and indicted on the same charges. It does not appear from the record that the state had obtained any new or different information from that recounted in the Officers' depositions.

Holmes filed suit on October 30, 2000, pursuant to § 1983, claiming that the officers violated her constitutional rights under the Fourth Amendment and that Cobb County had maintained a policy of training its police officers inadequately. The district court granted summary judgment to the officers on qualified immunity grounds and to the County because it could discern no policy or custom of inadequate training.

On appeal, Holmes argues that she adduced sufficient evidence to overcome summary judgment and proceed on her claims that Officers Kucynda, Poole, Bullock, and Rolfe violated her constitutional rights first, by entering the apartment without a warrant, and thereafter by their conduct while inside the apartment, by arresting her without probable cause, and by making material misrepresentations in the subsequent arrest warrant application. Holmes also argues that the district court erroneously granted summary judgment to Cobb County on her claim that it instituted a policy that failed to provide its police offi-

cers with adequate training regarding citizens' constitutional rights.[7]

## DISCUSSION

### A.

█ Summary judgment is appropriate only when the evidence before the court demonstrates that "there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). This court reviews *de novo* the district court's grant of summary judgment based on the defense of qualified immunity. *See Tinney v. Shores,* 77 F.3d 378, 380 (11th Cir.1996).

█ Qualified immunity protects government actors performing discretionary functions from being sued in their individual capacities. *See Wilson v. Layne,* 526 U.S. 603, 609, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999). The doctrine shields government officials "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Qualified immunity liberates government agents from the need to constantly err on the side of caution by protecting them both from liability "and the other burdens of litigation, including discovery." *Lambert v. Fulton County,* 253 F.3d 588, 596 (11th Cir.2001). *See also Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). At the same time, it does not offer protection "if an official

'knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff].' " *Harlow,* 457 U.S. at 815, 102 S.Ct. 2727 (quoting *Wood v. Strickland,* 420 U.S. 308, 322, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975)) (emphasis omitted). The essence of qualified immunity is notice. *See Hope v. Pelzer,* 536 U.S. 730, 122 S.Ct. 2508, 2515, 153 L.Ed.2d 666 (2002).[8]

█ Qualified immunity analysis proceeds in two steps. *See Chesser v. Sparks,* 248 F.3d 1117, 1121 (11th Cir.2001). First, we address the "threshold question" of whether the facts as alleged, viewed in the light most favorable to Holmes, establish a constitutional violation at all. *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). If no constitutional violation is established, then the defendants prevail, and "there is no necessity for further inquiries concerning qualified immunity." *Id.* But if a constitutional right would have been violated under the plaintiff's version of the facts, we then determine whether that right was clearly established. *Id.*

█ For a constitutional right to be clearly established, the contours of that right "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been

---

**7.** Kucynda, Poole, Bullock, and Rolfe each received Peace Officers' Standards and Training ("P.O.S.T.") prior to the arrest of Holmes and Wisong. P.O.S.T. training provides information to officers regarding the appropriate procedures and policies for determining probable cause for arrest and lawful searches and seizures.

**8.** To receive qualified immunity the public official "must first prove that 'he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred.' " *See Ferraro,* 284 F.3d at 1194 (quoting *Courson v. McMillian,* 939 F.2d 1479, 1487 (11th Cir.1991)). It is uncontested that Officers Kucynda, Rolfe, Bullock, and Poole acted within their discretionary authority.

held unlawful ... but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (citation omitted). As the Supreme Court recently clarified in *Hope*, the fact pattern of prior cases used to show that a right is clearly established need not be "fundamentally similar" or even "materially similar" to the facts alleged. *See Hope*, 122 S.Ct. at 2516. Rather, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Id.* Thus, the nub of the inquiry is whether "the state of the law [at the time of the alleged violation]" gave the officials "fair warning that their [acts were] unconstitutional." *Id.* We first address the summary judgment entered on behalf of Cobb County in this case.

### B.

■ Holmes argues that Cobb County maintained a deliberate policy of inadequately training its police officers on issues of warrantless entry, search, and arrest. However, Holmes has failed to adduce any evidence of a policy of inadequate training on the part of the County. Holmes simply alleges that Officers Rolfe, Bullock, Kucynda, and Poole were inadequately trained.

■ It is true that a local government may be held liable under § 1983 "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Mandel v. Doe*, 888 F.2d 783, 791 (11th Cir.1989) (citing *Monell v. Department of Social Servs.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). But to succeed on a § 1983 claim against the County in the absence of an official policy of inadequate officer training, Holmes must "prove the existence of a

widespread practice that, although not authorized by written law or express municipal policy, is 'so permanent and well settled as to constitute a "custom or usage" with the force of law.'" *St. Louis v. Praprotnik*, 485 U.S. 112, 127, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167–168, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)).

Holmes has failed to accomplish this task. Rather, the record shows that Cobb County has in place a training program, P.O.S.T., that is specifically designed to instruct officers assessing probable cause. Holmes offers no evidence, other than the actions of Officers Rolfe, Bullock, Kucynda, and Poole, to show that the County's P.O.S.T program provides inadequate training. As a consequence, the district court properly granted summary judgment on behalf of Cobb County.

We next turn to Holmes' claims that the district court erred in finding that the individual Officers were entitled to qualified immunity regarding their encounter with Holmes in the apartment.

### C.

■ A warrantless entry into a suspect's home is presumed to be an unreasonable violation of the Fourth Amendment. *See United States v. Tobin*, 923 F.2d 1506, 1510 (11th Cir.1991) (citing *Payton v. New York*, 445 U.S. 573, 586, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980)). However, consent to a warrantless entry may be given by the owner of the property to be searched. *See Illinois v. Rodriguez*, 497 U.S. 177, 181, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990).

Holmes first argues that the Officers entered Wisong's apartment with neither a warrant nor Wisong's consent. Although Wisong opened the door and stepped aside, Holmes suggests that these actions

did not amount to consent. Instead, Holmes contends that Wisong stepped aside out of deference to police authority. Because such deference cannot substitute for actual consent, Holmes argues the entry was unlawful.

We reject this argument because there is nothing in this record to contradict the Officers' testimony that when they asked if they could enter, Wisong stepped back in a gesture of acquiescence. Wisong did not testify below, and Holmes could not contradict the Officers' version of the facts because she was not there to view the encounter. She merely heard an Officer say "step back." This bare comment—without an attribution to a particular Officer or an indication of the context in which it was uttered—does not show that Wisong was coerced into allowing the Officers to enter the apartment. Accordingly the Officers' entry into Wisong's apartment did not violate Holmes' constitutional rights. *See Saucier*, 533 U.S. at 201, 121 S.Ct. 2151.

We next turn to Holmes' claims regarding the officers' actions while they were inside the apartment and find that the record, viewed in the light most favorable to Holmes, does not conclusively show that Holmes' Fourth Amendment right to be free from unreasonable searches and seizure was not violated. Thus, we conclude that summary judgment was erroneously granted on these claims.

### D.

 A warrantless arrest is constitutionally valid only when there is probable cause to arrest. *See United States v. Watson*, 423 U.S. 411, 417, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976); *United States v. Costa*, 691 F.2d 1358, 1361 (11th Cir.1982). Probable cause exists if, "at the moment the arrest was made, 'the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing' that [the suspect] had committed or was committing an offense." *Dahl v. Holley*, 312 F.3d 1228, at 1233 (11th Cir.2002) (quoting *Hunter v. Bryant*, 502 U.S. 224, 228, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991)). "Probable cause does not require the same type of specific evidence of each element of the offense as would be needed to support a conviction." *Adams v. Williams*, 407 U.S. 143, 149, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972).

 To receive qualified immunity protection, an officer "need not have actual probable cause but only '*arguable probable cause*.'" *Montoute v. Carr*, 114 F.3d 181, 184 (11th Cir.1997) (emphasis added). Because only arguable probable cause is required, "the inquiry is not whether probable cause actually existed, but instead whether an officer reasonably could have believed that probable cause existed, in light of the information the officer possessed." *Id.* Thus, "[e]ven law enforcement officials who 'reasonably but mistakenly conclude that probable cause is present' are entitled to immunity." *Hunter v. Bryant*, 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (citation omitted).

It is undisputed that Holmes did not have actual possession of the drugs found in Wisong's apartment. Therefore, whether the Officers had probable cause to arrest Holmes is dependent on whether it was arguably reasonable to conclude that Holmes exerted constructive possession over the discovered contraband. *See Montoute*, 114 F.3d at 184.

 This Court has defined constructive possession as "the knowing exercise of, or the knowing power or right to exercise, dominion and control over the

proscribed substance." *United States v. Glasgow,* 658 F.2d 1036, 1043 (5th Cir. Unit B 1981).[9] Constructive possession need not be exclusive, and may be proven through circumstantial evidence that shows ownership, dominion, or control over the drugs or the premises where the substance is located. *See United States v. Poole,* 878 F.2d 1389, 1392 (11th Cir.1989); *United States v. Martinez,* 588 F.2d 495, 498 (5th Cir.1979).[10] But it is not enough to show that the defendant simply visited or made temporary use of the premises. *See Minnesota v. Olson,* 495 U.S. 91, 99, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990) (noting that while an overnight guest has "a measure of control over the premises," the host has "ultimate control"); *United States v. Rackley,* 742 F.2d 1266, 1272 (11th Cir. 1984). Some "nexus" must exist between the accused and the contraband, as a defendant's "mere presence in the area of contraband or awareness of its location is not sufficient to establish possession." *United States v. Maspero,* 496 F.2d 1354, 1359 (5th Cir.1974). *See also United States v. Pedro,* 999 F.2d 497, 502 (11th Cir.1993). Most notably, a defendant must know of the substance's existence in order to exercise dominion and control over it. *See United States v. Gonzalez,* 71 F.3d 819, 834 (11th Cir.1996). *See also United States v. Mieres–Borges,* 919 F.2d 652, 657 (11th Cir.1990) (noting constructive possession requires "knowing exercise of or the knowing power or right to exercise dominion and control over the substance") (quotations and citations omitted).

In *Rackley,* 742 F.2d at 1272, we assessed the degree of control or dominion necessary to establish constructive posses-

sion over contraband. Rackley was one of three defendants arrested for possession of cocaine at a home in Fort Lauderdale, Florida. *See id.* at 1268. Although not the owner, Rackley "was a friend [of the lessee] who often stayed in the house" and who "had a key, as well as the right to exclude others from the house." *Id.* at 1269. Rackley "never kept a full wardrobe in the house when he was there" and "did not stay in the house immediately preceding the search and seizure." *Id.* at 1270. In deciding whether the district court erred by denying his motion for a judgment of acquittal, we concluded that Rackley did not possess "control or dominion over the [house] sufficient to establish constructive possession." *Id.* at 1272. That Rackley was present at the house where the drugs were found, had a key to the premises, was a frequent overnight guest, and had the power to exclude others from the house, did not establish the necessary "nexus" with the drugs to establish control and dominion. *See id.* Rather, *Rackley* established that constructive possession exists only when a defendant is able to exert more than minimal control and dominion over the premises where the contraband is located and has actual knowledge of the contraband's existence. *See id.* Other circuits have reached a similar conclusion. *See United States v. Quilling,* 261 F.3d 707, 712 (7th Cir.2001) (requiring a "substantial connection" to the premises where the contraband was found); *United States v. Heckard,* 238 F.3d 1222, 1228 (10th Cir.2001) (noting that in the context of jointly occupied premises "the government must offer evidence supporting at

---

**9.** In *Stein v. Reynolds Secur., Inc.,* 667 F.2d 33 (11th Cir.1982), the Eleventh Circuit adopted as binding precedent all decisions of Unit B of the former Fifth Circuit handed down after September 30, 1981.

**10.** In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

least a plausible inference that the defendant had knowledge of and access to the [contraband].") (quotations and citations omitted); *United States v. Solomon,* 29 F.3d 961, 963 n. 1 (5th Cir.1994) (stating the principle that "we do not lightly impute dominion and control to a person found in another person's house") (citing *United States v. Onick,* 889 F.2d 1425, 1429 (5th Cir.1989)); *United States v. Brown,* 3 F.3d 673, 681 (3d Cir.1993) (concluding that defendant's knowledge of drugs in house, coupled with her ability to exercise dominion and control over some of the property in the house, did not establish constructive possession of everything, including the drugs, located therein); *United States v. Pardo,* 636 F.2d 535, 549 (D.C.Cir.1980) ("In short, there must be something more than mere presence at the scene of a criminal transaction. There must be some action, some word, or some conduct that links the individual to the narcotics and indicates that he had some stake in them, some power over them.").

In the light most favorable to Holmes, nothing in this record reflects that there was even arguable probable cause to believe that Holmes knew about the drugs or had the requisite ability to exercise control or dominion over them. On the contrary, all of the available evidence supported the conclusion that she was simply a visitor. Holmes states in her deposition that she had no knowledge of the contraband and that no officer asked her prior to her arrest if she knew that there were drugs in the bedroom/office.[11] *See Mieres–Borges,* 919 F.2d at 657. No one alleges, and Holmes denies, that she ever had access to the second bedroom/office desk where the drugs were found hidden in a drawer. Holmes specifically informed the Officers that she did not reside in the apartment, and her visitor status was confirmed by the following facts: 1) her suitcases still had clothes in them; 2) her toiletry items were found in a travel bag; and 3) her drivers license indicated she lived in Norcross, Georgia.

■ Other than Holmes' mere presence in the house, there was absolutely nothing at the time of her arrest to support a plausible inference that she had knowledge of, or control or dominion over, the contraband. No action or word or conduct is reflected in this record that would arguably suggest a link between Holmes and the narcotics. Thus, based on the information available to the Officers under Holmes' version of the facts, it was not even arguably reasonable for Officer Rolfe to arrest Holmes for constructive possession of illegal contraband. *See Jones v. Cannon,* 174 F.3d 1271, 1285 (11th Cir.1999). This circuit's case law has clearly established that "[m]ere presence at the scene of a crime, without more, does not support a finding of probable cause to arrest." *United States v. Gonzalez,* 70 F.3d 1236, 1238 (11th Cir.1995); *Pedro,* 999 F.2d at 502; *Wilson v. Attaway,* 757 F.2d 1227, 1238 (11th Cir.1985); *United States v. Irurzun,* 631 F.2d 60, 62 (5th Cir.1980); *United States v. Ashcroft,* 607 F.2d 1167, 1171 (5th Cir.1979). *See also Ybarra v. Illinois,* 444 U.S. 85, 91, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979) ("[A] person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to [arrest] that person."). Accordingly, we conclude that the Officers are not entitled to qualified immunity regarding Holmes' arrest and, therefore, reverse the district court's grant of summary judgment.

11. After her arrest, Officer Kucynda did eventually ask Holmes if the drugs that the officers found were hers. Holmes replied that they were not.

 We also reject the Officers' argument that the searches in this case were constitutionally permissible because they were searches "incident to arrest." A warrantless search is *per se* unreasonable under the Fourth Amendment unless it falls within one of several specifically established and well-delineated exceptions. *Mincey v. Arizona,* 437 U.S. 385, 390, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978) (quoting *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)). A search incident to arrest is one of these exceptions and is designed to ensure the protection of law enforcement officers as they conduct an arrest. *See Chimel v. California,* 395 U.S. 752, 763, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). "When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape. Otherwise, the officer's safety might well be endangered, and the arrest itself frustrated." *Id.* at 762–63, 89 S.Ct. 2034. Under the same rationale, the Supreme Court in *Chimel* further authorized officers to search for and seize evidence in the immediately surrounding area "into which an arrestee might reach in order to grab a weapon or evidentiary items." *Id.* at 763, 89 S.Ct. 2034. A search incident to arrest may extend into the immediately surrounding area because "[a] gun on a table or in a drawer in front of one who is arrested can be as dangerous to the arresting officer as one concealed in the clothing of the person arrested." *Id.* However, the "search incident to arrest" is a limited exception; it "places a temporal and a spatial limitation on searches incident to arrest, excusing compliance with the warrant requirement only when the search 'is substantially contemporaneous with the arrest and is confined to the immediate vicinity of the arrest.' " *New York v. Belton,* 453 U.S. 454, 465, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981) (citations omitted). Thus, officers may only search areas "within [the arrestee's] immediate control" construed as "the area from within which he might gain possession of a weapon or destructible evidence." *Chimel,* 395 U.S. at 763, 89 S.Ct. 2034. As the Court stated, "[t]here is no comparable justification, however, for routinely searching any room other than that in which an arrest occurs—or, for that matter, for *searching through all the desk drawers or other closed or concealed areas in that room itself.*" *Id.* (emphasis added).

Holmes testified in her deposition that she did not consent to the search of her purse or personal effects and, at the summary judgment stage, we must consider the facts in the light most favorable to Holmes. *See Ferraro,* 284 F.3d at 1190. Bullock's search of the bedroom cannot be viewed as a "search incident to arrest" because it was not contemporaneous with, or conducted in the vicinity of, Holmes' arrest. Officer Rolfe placed Holmes under arrest in the living room, several minutes after Bullock conducted his search of the bedroom and her possessions. Similarly, the Officers' post-arrest search of Holmes' purse is not amenable to the "search incident to arrest" exception. Holmes had already been arrested and was in custody at the Cobb County Adult Detention Center when the alleged search occurred. A search incident to arrest is specifically limited to areas "within [the arrestee's] immediate control," *Chimel,* 395 U.S. at 763, 89 S.Ct. 2034, and must be "substantially contemporaneous" with the arrest. *Belton,* 453 U.S. at 465, 101 S.Ct. 2860. Because no exception to the general Fourth Amendment bar on warrantless searches is implicated here, we find that these searches violated Holmes' constitutional

rights. *Mincey,* 437 U.S. at 390, 98 S.Ct. 2408.

Moreover, at the time these incidents occurred, the case law clearly established that such searches were unconstitutional. See *Chimel,* 395 U.S. at 763, 89 S.Ct. 2034; *Gonzalez,* 71 F.3d at 825. It is undisputable that a reasonable police officer in 1998 should have been aware that a nonconsensual, warrantless search of Holmes' personal belongings in the bedroom and purse in the living room, under the circumstances here, would violate her constitutional rights. See *id.*; *Payton,* 445 U.S. at 586, 100 S.Ct. 1371.

### E.

█ Finally, Holmes takes issue with the district court's grant of summary judgment on her claim that Officer Rolfe filed a recklessly false warrant application with the Cobb County Superior Court. Specifically, Holmes argues that Rolfe knowingly included false statements on the application suggesting that the cocaine and marijuana, as well as loose marijuana seeds, were discovered in the bedroom in which Holmes slept. Holmes further contends that the warrant application included additional handwritten notes, presumably made by the magistrate judge based upon Rolfe's oral statements to him, which falsely denote that she was "evasive as to the presence of others," that she and Wisong "both sleep in the bedroom with the drugs," and that "custody [of the apartment] was joint." The implication, Holmes suggests, is that these notes represent the magistrate's transcription of the facts that Rolfe verbally communicated. Since the facts known to Rolfe at the time he signed the warrant application plainly illustrated the falsity of these allegations, Holmes argues that Rolfe's statements are material misrepresentations and, as such, Rolfe is not entitled to qualified immunity.

█ The Warrant Clause of the Fourth Amendment requires that warrant applications contain sufficient information to establish probable cause. *Franks v. Delaware,* 438 U.S. 154, 164, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). "[W]hen the Fourth Amendment demands a factual showing sufficient to comprise 'probable cause,' the obvious assumption is that there will be a *truthful* showing." *Id.* at 164–65, 98 S.Ct. 2674 (citation omitted) (emphasis in original). While this condition does not dictate that the statements be objectively accurate, it does require that they "be 'truthful' in the sense that the information put forth is believed or appropriately accepted by the affiant as true." *Id.* at 165, 98 S.Ct. 2674. Thus, a police officer may be held liable under 42 U.S.C. § 1983 for submitting an application for an arrest warrant that contains false information. See *Malley v. Briggs,* 475 U.S. 335, 346, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986); *Cannon,* 174 F.3d at 1285. If "a reasonable police officer would have known that [Rolfe's] testimony was not just negligently false, but recklessly so," then Rolfe is not entitled to qualified immunity. *Kelly v. Curtis,* 21 F.3d 1544, 1554 (11th Cir.1994).

Viewed in the light most favorable to Holmes, the facts support a conclusion that Rolfe's warrant application included deliberately false statements about the incidents leading to Holmes' arrest. The information that Rolfe acquired during his personal inspection of Holmes' identification indicated that she did not reside in Wisong's apartment. He also knew from the statements of both Wisong and Holmes, as well as the physical configuration of the furniture, furnishings, clothes, bed, and suitcases, that neither Holmes nor Wisong slept in the bedroom/office where the drugs were found, and that neither he nor Bullock observed loose mar-

1084

ijuana seeds on the desk. Moreover, no Officer testified that Holmes had been evasive. To the contrary, each Officer testified that Holmes had fully answered their questions. Based on these facts, the district court could not conclusively determine that Rolfe's statements were not made in "reckless disregard of the truth" and, therefore, did not violate the Constitution under *Franks*. *Id.* at 1554.

"[T]he law was clearly established in [1998] that the Constitution prohibits a police officer from knowingly making false statements in an arrest affidavit about the probable cause for an arrest." *Cannon*, 174 F.3d at 1285. *See also Kelly*, 21 F.3d at 1554 (stating that "a police officer violates the Constitution if, in order to obtain a warrant, she perjures herself or testifies in reckless disregard of the truth"); *Garmon v. Lumpkin County*, 878 F.2d 1406, 1410–11 (11th Cir.1989) (holding Lumpkin County sheriff was not entitled to qualified immunity where he directed an investigator to submit a warrant application that contained knowingly false statements). Accordingly, Rolfe is not entitled to qualified immunity on this issue.

## CONCLUSION

For the foregoing reasons, we affirm the summary judgment on behalf of the County. We affirm that portion of the summary judgment that grants qualified immunity to the officers on Holmes' claim that they entered the apartment without consent. We vacate and reverse the remainder of the summary judgment granted to the officers.

AFFIRMED in part and REVERSED in part.