STAHL, Circuit Judge,
dissenting:
The defense of qualified immunity attempts to strike a balance between the need for a remedy to protect the rights of citizens from government excess and the need for government officials to be able to carry out their discretionary functions without fear of constant litigation. GJR Investments, Inc. v. County of Escambia, Fla., 132 F.3d 1359, 1366 (11th Cir.1998). In this case, we address the violation of a clearly established constitutional right by a police officer who had more than enough awareness of the surrounding circumstances to know that her arrest of plaintiff Albert Durruthy, and the force used in so doing, was not only unnecessary, but unlawful. Whether under a standard of probable cause or arguable probable cause to arrest, the facts of this case, made all the more apparent and troubling by videotape evidence of the arrest, preclude any notion that Officer Pastor, or any reasonable police officer, could have believed that probable cause to arrest existed. Qualified immunity is inappropriate here, especially at the summary judgment stage. Accordingly, with respect, I dissent.
First, we must consider the threshold issue of whether Durruthy’s allegations, if taken as true, establish a violation of his constitutional right against unlawful arrest under the Fourth Amendment of the federal Constitution. -See Hope v. Pelzer, 536 U.S. 730, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002). The evidence shows that there simply was no reason for Durruthy’s arrest. The videotape squarely refutes Pastor’s initial stated basis for the arrest of Durruthy, which was allegedly his obstruction of an officer’s arrest of Bruce Bernstein, an NBC cameraman, and his failure to obey another officer’s order to leave the street. See Fla. Stat. § 843.02. There were no acts of civil obedience taking place and no protestors or moving vehicles in the street. Moreover, the police were not clearing the area in which Durruthy was filming. Pastor herself was standing in a line of officers approximately sixty feet away from Durruthy. She left the line, without the permission of any superior officer, and rushed over to Durruthy though she plainly saw that he was following another officer’s direct order to “get off the street.” She admitted that she was aware that Durruthy was a member of the press and saw that he was carrying a large television camera, but nonetheless helped pin him to the ground and forcibly secure him by wrenching his right arm behind his back and pressing his head to the sidewalk. Though Durruthy repeatedly pled with Pastor and the other officers that he would go peacefully and that his “bad arm” would not bend backward, Pastor and the other officers did not relent.
In addition, George Bouza — Durruthy’s “sound man” who recorded audio of the events — approached the scene, attempted to inform the attending police officers, including Pastor, that he was Durruthy’s partner, and convinced the officers to give him Durruthy’s camera, which they had taken from Durruthy before forcing him to the ground. Yet, Pastor continued to pin Durruthy to the sidewalk and proceed with the arrest without regard to the obvious pain and injury she was inflicting even though Durruthy was neither resisting the officers nor presenting any danger. Pastor knew all of this. Thereafter, Durruthy was held in a police van without medical *1096 care for six hours before being released. A prudent officer with Pastor’s knowledge of the situation, under the circumstances, could not have believed that Durruthy had committed, was committing, or was about to commit an offense which justified arrest.
Moreover, when Durruthy and his criminal defense attorney met with the State Attorney several weeks after the arrest, Durruthy’s counsel showed the State Attorney the videotape of the arrest. The State Attorney immediately decided to drop all charges against Durruthy, and asked him to sign a release of liability in favor of the Miami Police Department and its officers. Durruthy refused to sign the release.
In a thoughtful opinion, the district court concluded that a reasonable jury could find that Pastor arrested Durruthy without probable cause. See Durruthy v. City of Miami, 235 F.Supp.2d 1291 (S.D.Fla.2002). The court further found that there was sufficient evidence to show that Pastor did not even have arguable probable cause, that is, there existed sufficient proof that “no reasonable police officer in the position of Pastor could have believed that there was probable cause to arrest Plaintiff.” Id. at 1296-97.
The majority’s decision adopts Pastor’s argument made to the district court that even if there was no probable cause or arguable probable cause to arrest Durru-thy for obstructing or resisting the officers, there was probable cause or at least arguable probable cause to arrest him under Fla. Stat. § 316.30. The district court found this argument unconvincing because § 316.130 “is directed at preventing pedestrians from walking among vehicular traffic” and “there was no vehicular traffic in the roadway.” Durruthy, 235 F.Supp.2d at 1298. The majority points out that the statute does not require that there be vehicular traffic in the roadway at the time of the offense and that it contains no exception for anyone, including members of the media. Indeed, Durruthy acknowledges that he was not entitled to a special exception because he was a cameraman. The fact that he was a cameraman, however, and that he was performing his duties as a cameraman at the time of the arrest goes to the core of the qualified immunity analysis.
And that is where the district court is correct and the majority of this Court wrong with respect to Pastor’s arguable probable cause to arrest under § 316.130. Again, the district court pointed out that “[t]he statute is directed at preventing pedestrians from walking among vehicular traffic.” 235 F.Supp.2d at 1298. Notwithstanding what the statute does and does not require, “an arrest pursuant to § 316.130 could not be reasonable” given that at the time of the arrest, Pastor knew that “there was no vehicular traffic in the roadway” and that Durruthy was “an obvious member of the media acting within the scope of his journalistic duties.” Id. In my view, the district court correctly analyzed the applicability of § 316.130 in terms of whether Pastor, at the time of the arrest and given her knowledge of the circumstances, had arguable probable cause to arrest based on § 316.130. The inquiry is not whether Durruthy actually violated the statute or whether the elements of the statute were met, but whether it was objectively reasonable for Pastor to arrest Durruthy given the obvious circumstances. Pastor’s invocation of § 316.130 fails to amount even to an after-the-fact excuse for her actions. Durruthy was charged only with obstruction of an officer under Fla. Stat. § 843.02, and that charge was dropped immediately by the State Attorney upon viewing the videotape of the arrest. Pastor never articulated *1097 § 316.130 as the purported basis for the arrest at the time of the arrest and raised it as a justification for the arrest only after the commencement of this litigation. Though I acknowledge that an arrest is not rendered invalid by the fact that the basis for the arrest, though legitimate, was merely pretextual, see Whren v. United States, 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996), we should “be troubled by an argument suggesting that a legitimate basis for an arrest identified only after the arrest would provide sufficient grounds therefor.” Rogers v. Powell, 120 F.3d 446, 453 n. 5 (3d Cir.1997) (emphasis added). Moreover, it is patently obvious to any observer of the videotape evidence that the sole reason for Pastor’s conduct was that she and the other officers wanted Durruthy to stop filming the arrest of the NBC cameraman. No one has argued that the mere act of Durruthy’s filming is a crime, unlike the scenarios in Whren, United States v. Holloman, 113 F.3d 192 (11th Cir.1997), and other cases cited by the majority where the officers’ purported bases for arrest were obvious pretexts for suspicion of drug possession, murder, and other crimes.
The majority states that “[t]he heart of Durruthy’s argument is that there was no probable cause for his arrest because he had permission to be in the street” and proceeds to discredit Durruthy’s testimony as “vague, general, and stated at the highest order of abstraction.” Given that the case is at the summary judgment stage, we must resolve all issues of material fact in favor of Durruthy before determining the legal question of whether the defendant is entitled to qualified immunity under Dur-ruthy’s version of the facts. See Lee v. Ferraro, 284 F.3d 1188, 1190 (11th Cir.2002). Durruthy’s testimony on whether he had permission to be in the street still leaves a genuine issue of material fact as to whether Pastor was aware, with notice that Durruthy (and the media overall) was authorized to be in the street, that she was violating a clearly established federal right when she arrested him. See Penn v. City of Miami, 1999 WL 1050059, *18 (S.D.Fla. Sept.7, 1999).
As to the issue of whether Durruthy’s constitutional right against illegal arrest was “clearly established,” the majority relies on this Circuit’s “rigid gloss” of how exactly such a right is “clearly established.” Hope, 536 U.S. at 739, 122 S.Ct. 2508. Durruthy has argued that Pastor’s violation of a Miami Police Department internal policy shows Pastor’s knowledge of the unlawfulness of her actions. The policy reads:
No warrantless arrest of media personnel for non-felonious acts arising out of the pursuit of the news gathering function will be made without the express authority of the senior on-duty commanding officer or the staff duty officer.
City of Miami’s Office Bulletin # 00-4 dated January 14, 2000.
Chief of Police Raul Martinez explained that the Department’s media policy granted a higher degree of courtesy to members of the media than to average citizens and that if a member of the media complies with a police officer’s request to move, such compliance should be the end of the incident.
The majority claims that it cannot find any precedent that “even remotely suggests that the possible violation of an internal law enforcement guideline” defeats an official’s qualified immunity. Hope, however, a decision by the United States Supreme Court that directly addresses this Circuit’s strict view of qualified immunity, stands in part on guidelines and regulations issued by law enforcement. Hope, an inmate assigned to Limestone Correctional Facility in Alabama, was twice hand *1098 cuffed to a “hitching post” for several hours as punishment for disruptive behavior. This Court found that though “cuffing an inmate to a hitching post for a period of time extending past that required to address an immediate danger or threat is a violation of the Eighth Amendment,” Hope v. Pelzer, 240 F.3d 975, 980 (11th Cir.2001), the defendant prison guards were still entitled to qualified immunity because “there was no clear, bright-line test established [at the time of the violation] that would survive our circuit’s qualified immunity analysis.” Id. at 981. This Court went on to explain that “it is important to analyze the facts in ... [prior] cases, and determine if they are ‘materially similar’ to the facts in the case in front of us.” Id. “[A]nalogous” facts, the Court concluded, are not enough. Id. Instead, the facts must be “ ‘materially similar’ to Hope’s situation.” Id.
The Supreme Court reversed and rejected this Court’s analysis and asserted that “this rigid gloss on the qualified immunity standard ... is not consistent with our eases.” Hope, 536 U.S. at 739, 122 S.Ct. 2508. The Court continued:
officials can still be on notice that their conduct violates established law even in novel factual circumstances.... Although earlier cases involving “fundamentally similar” facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding. The same is true of cases with “materially similar” facts.... [T]he salient question that the Court of Appeals ought to have asked is whether the state of the law in 1995 gave respondents fair warning that their alleged treatment of Hope was unconstitutional.
Id. at 741, 122 S.Ct. 2508.
The Court, as part of its analysis, considered (1) a regulation issued by the Alabama Department of Corrections (ADOC) and (2) a report and advisory letter issued by the U.S. Department of Justice to the ADOC before the incidents of Hope’s mistreatment. The ADOC regulation authorized the use of the hitching post when an inmate refused to work or was otherwise disruptive to the prison work squad. It provided that an activity log should be completed for each such inmate, detailing his responses to offers of water and bathroom breaks every fifteen minutes. The regulation also stated than an inmate had to be released back into the work squad whenever he told an officer that he was ready to go back to work. The log was not completed for Hope’s second shackling, which lasted for seven hours, and the evidence showed that the periodic offers contemplated by the regulation were never made to Hope. The evidence also showed that the regulation was frequently ignored for other prisoners. The Court concluded that the regulation and the fact that the prison guards “could ignore it with impunity” provided “strong support for the conclusion that they were fully aware of the wrongful character of their conduct.” Id. at 744, 122 S.Ct. 2508.
In addition, the Court asserted that “its conclusion ‘that a reasonable person would have known’ [was] buttressed” by a report and letter sent to the ADOC from the U.S. Department of Justice in which the DOJ specifically advised that the systematic use of the hitching post constituted improper corporal punishment. See id. at 745, 122 S.Ct. 2508. The Court concluded that though the DOJ’s views may not have been communicated to the prison guards, the “exchange lends support to the view that reasonable officials in the ADOC should have realized that the use of the hitching post under the circumstances alleged by Hope violated the Eighth Amendment pro *1099 hibition against cruel and unusual punishment.” Id.
The majority asserts that the existence of the Miami Police Department’s internal guideline “does not undermine objective facts” surrounding the scene of the incident. Indeed, the guideline “does not convert an illegal act suddenly into a legal one.” It does, however, bear strongly on Pastor’s knowledge of the circumstances, of how she should act in such circumstances, and ultimately on the issue of whether a reasonable police officer with her knowledge would have probable cause to arrest Durruthy. Again, Pastor admits that she knew Durruthy was a member of the media. Her knowledge of the guideline put her on clear notice that she was not supposed to arrest a newsman without permission from a supervising officer. As the district court correctly assessed, “When an obvious member of the media approaches a police officer in a cleared street, is instructed to return to the sidewalk, and complies with the instruction, a police officer should be aware that a custodial arrest based on interference with a police officer is illegal.” 235 F.Supp.2d at 1298. It is on these objective facts that the Miami PD’s internal guideline sheds additional light in favor of finding against qualified immunity at the summary judgment stage.
Notwithstanding the issue of whether and how much notice the Miami PD’s internal guideline provided, this case is very similar to Holmes v. Kucynda, 321 F.3d 1069 (11th Cir.2003), where Atlanta police arrested the plaintiff, Holmes, for constructive possession of cocaine and marijuana. At the time of the arrest, the police had reason to believe that Holmes was just a visitor in the apartment where the drugs were discovered. She specifically informed the officers that she did not reside in the apartment, her suitcases still had clothes in them, her toiletry items were found in a travel bag, and her driver’s license indicated that she lived in Nor-cross, Georgia. Id. at 1081. Other than her mere presence in the house, the evidence showed nothing from which to infer that Holmes had knowledge of, control or dominion over, the drugs. See id. Thus, there was reason to know that she was not in possession of the drugs. In reversing the district court’s award of summary judgment to the arresting officers, this Court observed that similar reported cases need not be identified after Hope. Id. at 1078. Under the Eleventh Circuit’s “arguable probable cause” standard, this Court inquired, taking the facts in the “light most favorable to Holmes,” id. at 1081, whether a reasonable officer would have known there existed no arguable probable cause to make the arrest. The Court held that “it was not even arguably reasonable for Officer Rolfe to arrest Holmes for constructive possession of illegal contraband.” Id. Hence, qualified immunity was not proper at the summary judgment stage.
The unique facts here on their own establish the egregiousness and illegality of Officer Pastor’s conduct. Pastor “did not need specific case law to give her fair warning that an arrest in these circumstances could violate Plaintiffs Fourth Amendment rights.” Durruthy, 235 F.Supp.2d at 1298. The majority opinion sets the bar prohibitively high and tips the balance contemplated by qualified immunity away from the Constitution. Aggrieved individuals will have less incentive to challenge unwarranted and unconstitutional government actions because monetary compensation for their harms is unavailable. In the end, unconstitutional government action is more likely to go unchallenged and unchanged. That is our ultimate concern.
*1100 Hence, in my view, the district court did not err by denying Pastor qualified immunity at the summary judgment stage and I would affirm that decision.