868 So.2d 786 (2003)
STATE of Louisiana
v.
Robert PETERSON.
No. 2003 KW 1806.
Court of Appeal of Louisiana, First Circuit.
December 31, 2003.
*788 Doug Moreau, District Attorney, Baton Rouge, by Aaron Brooks, Assistant District Attorney, Counsel for Plaintiff/Respondent State of Louisiana.
Kevin P. Monahan, Baton Rouge, Counsel for Defendant/Relator Robert Peterson.
Before: WHIPPLE, KUHN, and MCDONALD, JJ.
KUHN, J.
Relator has been indicted with second degree murder of Gary Butler. He filed various motions to suppress evidence in which he sought suppression of statements, test results, and physical evidence on the ground there was no probable cause to believe relator committed the offense, the affiant for the arrest and search warrants omitted material facts with intent to deceive, and, if the misstatements were made without intent to deceive, the remainder of the warrants were not sufficient to support a finding of probable cause. The trial court denied the motions to suppress, and relator filed an application for supervisory writs seeking review of that ruling. This court granted certiorari to determine if the court erred when it denied the motions to suppress.
On February 17, 2001 at about 3:35 a.m., Gary Butler was found dead at his residence. He had been cut and stabbed numerous times, and there was a large amount of blood on the floors, walls, and furniture. Detectives Lonnie Lockett and Madeline Brooks of the Baton Rouge Police Department investigated the murder. They talked to several people and secured fingerprint samples from those individuals. None of the samples matched to prints left at the scene.
During the investigation, the detectives interviewed Gerald Lane, a man who had known the victim for several years. He told the detectives that, at about midnight (prior to the victim's body being found), he saw the victim get into a dark green car. The victim was alone when Lane saw him. *789 About three months after the offense, Mark Williams called detectives to say he had been talking to a friend in the neighborhood when the two of them saw a car drive by. The friend told Mark it was the same vehicle he had seen the victim in on the night of the murder. The vehicle matched the description provided earlier by Gerald Lane. Mark gave the detectives the license number for the vehicle, and the detectives determined the car was registered to relator (Robert Peterson). Earlier, family members had told Lockett that the victim had been hanging out with someone named "Rob."
Lockett included relator's picture in a photographic display, and he showed that display to people who knew the victim. Lockett testified that those people said relator looked like the man the victim "had been seen with just prior to him getting killed." Upon further examination, Lockett admitted the witnesses who viewed the display were unsure if "Rob" was in the photographic lineup but they thought the person in position number 2 (relator's picture) was the man they knew as Rob.
The detectives then went to talk to relator. Lockett testified that "one of my objectives" was to get relator to give palm prints. Detective Brooks testified that getting the prints was the "main goal." The detectives located relator at home at about 9 a.m. Lockett knocked on relator's door, identified himself, and asked relator, "Do you mind coming downtown to answer some questions." Relator agreed to go to the police station. Lockett did not tell relator he had to come, and he did not give relator any information about the crime. The detectives were investigating relator for the murder, but they did not tell him he was under investigation for the murder.
On the way to the police station, relator rode in the back seat of Lockett's vehicle. He was not in handcuffs, and he was not under arrest. If he had wanted to open the door, he could have. According to Lockett's testimony, if relator had asked to follow them in a different vehicle, he probably would have allowed it. The detectives did not view the encounter as being a custodial situation, and they did not advise relator of his rights.
Upon arrival at the detective office, Lockett "asked" relator to provide fingerprints and relator "submitted." According to Lockett, relator submitted "voluntarily." Detective Brooks testified that when they asked relator to submit to giving palm prints, he said, "no problem." Lockett did not tell relator why they wanted the prints, and he did not tell relator he was not required to give the prints. The prints were taken before relator was advised of his rights or had signed a rights form.
After the detectives got the prints, they told relator they were investigating a homicide. They advised relator of his rights and secured a waiver. Relator then made a statement. He told the detectives he did not really know the victim. When the detectives told relator people had seen him with the victim, relator admitted he had gone to the victim's apartment to help the victim move. Relator said he did not go into the apartment, and he claimed he did not know exactly where the apartment was located. Lockett told relator he did not believe him, and he gave relator the opportunity to take a voice stress analysis test. Relator said he did not want to take the test until he talked to his wife and he did not want to answer any more questions. The officers then brought relator home. Lockett estimated relator was with the officers for about one and one-half hours.
The detectives submitted the prints to the crime lab. When the crime lab notified the detectives that relator's prints matched those left at the scene, Lockett *790 secured a warrant for relator's arrest and a warrant to search relator's residence and car. In the affidavit for the arrest warrant, Locked stated: "During the investigation detective interviewed friends of the victim and learned that the victim was last seen with the defendant prior to the stabbing." The affidavit submitted in connection with the state's request for the search warrant (prepared on the same date as the arrest warrant) contains somewhat different language: "During the investigation detective learned that the victim had been with the defendant (Robert W. Peterson W/M DOB 3/17/67) prior to the stabbing."
While executing the search warrant, the officers seized relator's car. Although it is not clear from the motions or the testimony exactly what physical evidence, other than the palm prints, relator sought to suppress, discovery responses contained in the record indicate the crime laboratory determined that bloodstains found inside relator's vehicle matched to the victim's DNA.
Relator testified at the hearings held on his motions to suppress. He said the officers arrived at his residence, asked if he was Robert Peterson, and asked if he would "come down to the shop with them." He had recently been fired from Wild's Car Care, and he thought the officers were investigating a recent theft at that business and were taking him to his former place of employment. Relator said only two officers came to his residence, and their guns were not drawn. He was not dressed when the officers arrived, and they came inside while he dressed. They did not follow him into his bedroom, and he did not object to them coming inside his residence. They did not frisk him. He had two cars at the residence, but he did not ask to drive himself. He explained that his license had been taken from him in a recent DWI arrest.
Relator further testified that, after he arrived at the police station, the detectives put him in a "little room for a short period of time." Then Lockett brought him upstairs to be printed. Lockett did not tell him he had the right to not give the prints and did not tell him he was being investigated for a murder.
Relator testified that, while he was at his house with the officers, he did not consider himself to be under arrest. It was not until Lockett took him to get the fingerprints that he considered himself to have been arrested. The officers never told him he was being arrested. When he later asked to go home, the officers waited about 10 minutes before bringing him home. When the officers dropped him off, they gave him a business card and asked him to call if he remembered or heard anything. Relator testified that he did not think he was under arrest when the officers brought him home, but he had thought he was under arrest while he was being fingerprinted.
Relator argues the evidence of his palm prints should be suppressed because he was not advised of either the reason for the detention or of his Miranda rights before his palm prints were obtained. Relator also claims there was no probable cause for his detention, and the trial court erred when it made a factual determination that he consented to the taking of his prints.
In denying the motion to suppress evidence of the palm prints, the trial court stated:
This case in my opinion smelled of deception and subterfuge. But does it equate to unlawful conduct by law enforcement? The defendant testified that he thought there was a possibility that *791 he was being asked to go to the station to be questioned for a theft that possibly occurred at his former place of employment.... But he never testified to any fact that leads the court to believe that he was detained against his will or [that] he was under lawful arrest either subjectively or objectively.
Thus, the trial court concluded it was not necessary for Detective Lockett to advise relator of his Miranda rights or the reason for the request.
Under the Fifth Amendment it is not necessary to advise a defendant of his Miranda rights prior to taking his prints. See State v. Allen, 440 So.2d 1330, 1333 (La.1983). See also Schmerber v. California, 384 U.S. 757, 761, 86 S.Ct. 1826, 1830-31, 16 L.Ed.2d 908 (1966); State v. Sheppard, 350 So.2d 615, 639 (La.1977). The higher standard of individual liberty provided by the Louisiana Constitution in article I, section 16 has not been extended to include evidence that an accused might be compelled to give (such as blood, urine, hair, saliva, and prints), and the Louisiana Constitution does not provide any greater protection in this area. State v. Pierre, 606 So.2d 816, 818 (La.App. 3d Cir.), writ denied, 607 So.2d 568 (La.1992).
The Louisiana Constitution does require authorities to advise a person "fully of the reason for his arrest or detention" and of his constitutional rights if the person "has been arrested or detained in connection with the investigation or commission of any offense." La. Const. art. I, § 13. See also La.C.Cr.P. art. 218.1. Whether or not relator was being detained when his prints were taken is also relevant for federal Fourth Amendment purposes. Mere communications between officers and citizens implicate no Fourth Amendment concerns if there is no coercion or detention. State v. Fisher, 97-1133, pp. 4-5 (La.9/9/98), 720 So.2d 1179, 1183.
In Davis v. Mississippi, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969), the U.S. Supreme Court held that fingerprints obtained as a result of an unlawful detention were obtained in violation of the Fourth and Fourteenth Amendments and were inadmissible as evidence. In Davis, police officers in Meridian, Mississippi, took at least twenty-four young black men (including the 14-year-old defendant) to police headquarters where the men were questioned briefly, fingerprinted, and then released without charge. At the time of the defendant's detention, the state did not have probable cause to arrest or a warrant for the defendant's arrest, and the defendant did not consent to being taken to the police station. The FBI compared defendant's prints with prints lifted at the scene of a rape and determined they matched. In response to the defendant's argument that the fingerprint evidence should be suppressed, the State of Mississippi argued that the exclusionary rule should not apply to the fingerprint evidence because of its inherent trustworthiness. The Court rejected this argument and held that detentions for the sole purpose of obtaining fingerprints are subject to the constraints of the Fourth Amendment. 89 S.Ct. at 1397-98.
The Supreme Court reaffirmed Davis in Hayes v. Florida, 470 U.S. 811, 105 S.Ct. 1643, 84 L.Ed.2d 705 (1985): "[N]one of these cases have sustained against Fourth Amendment challenge the involuntary removal of a suspect from his home to a police station and his detention there for investigative purposes, whether for interrogation or fingerprinting, absent probable cause or judicial authorization." 105 S.Ct. at 1646. The Court said that probable cause or a warrant would be required for the police to forcibly remove a person from his home or other place in which he is entitled to be and transport him to the *792 police station, where he is detained, even if just briefly, for investigative purposes. 105 S.Ct. at 1647. The Court also said the Fourth Amendment would permit seizures for the purpose of fingerprinting, if there is reasonable suspicion the suspect has committed a criminal act, if there is a reasonable basis for believing the fingerprinting will establish or negate the suspect's connection with the crime, and if the procedure is carried out with dispatch (such as a brief detention in the field). 105 S.Ct. at 1647.
In the instant case, the detectives did not have probable cause when they asked relator to come to the station. Thus, if relator was under arrest or being detained at the time his prints were taken, such detention was unlawful. However, if, as the trial court determined, relator was not being detained and voluntarily agreed to provide his prints, then there was no constitutional violation.
When reviewing a trial court's ruling on a motion to suppress based on findings of fact, great weight is placed on the trial court's determination because the court had the opportunity to observe the witnesses and weigh the relative credibility of their testimony. State v. Aucoin, 613 So.2d 206, 209 (La.App. 1st Cir.1992). Appellate courts will not set a credibility determination aside unless it is clearly contrary to the record evidence. But the legal findings of the trial court on a motion to suppress are subject to review without the great deference standard attached to credibility determinations. State v. Payne, XXXX-XXXX, p. 6 (La.12/4/02), 833 So.2d 927, 933.
Arrest is defined as "the taking of one person into custody by another. To constitute arrest there must be an actual restraint of the person. The restraint may be imposed by force or may result from the submission of the person arrested to the custody of the one arresting him." La.C.Cr.P. art. 201. Whether a person has been arrested is determined by an objective test; neither the person's subjective impression nor the lack of formality of the arrest resolves the issue. The determination of whether an arrest occurred depends on the totality of the circumstances, but several factors distinguish an arrest from lesser infringements on personal liberty. A prime characteristic of any Fourth Amendment seizure of a person is whether, under the totality of the circumstances, a reasonable person would not consider himself or herself free to leave. Ultimately, whether a person has been arrested depends on circumstances indicating an intent to impose an extended restraint on the person's liberty. State v. Fisher, 97-1133 at p. 6, 720 So.2d at 1183. See also State v. Dickinson, 492 So.2d 173, 176 (La.App. 1st Cir.), writ denied, 498 So.2d 14 (La.1986).
In the instant case, two detectives appeared at relator's residence at 9 a.m. They asked relator if he would come to the police station, and relator agreed. The detective's guns were not drawn, and they did not frisk relator or put him in handcuffs. The detectives transported relator to the station in the back of a police vehicle. The detectives did not consider relator to be under arrest, but their intent was to get his prints. They did not advise him of the nature of the investigation, and they did not tell him he did not have to go with them. It was not until the fingerprinting took place at the station that relator believed he was under arrest. However, when relator refused to answer any further questions and asked to leave, the detectives stopped the questioning and brought him home. Under these circumstances, the trial court did not err when it determined relator was not being detained when he agreed to provide his prints.
*793 Relator further argues the arrest and search warrants are invalid because the affidavits contain false and misleading information and are based on the unlawfully obtained prints. Insofar as the motion to suppress the "arrest warrant" was concerned, the trial court said the statement that the victim was last seen alive with relator was "not accurate," was misleading, and was not based on fact. The trial court believed the affidavit should have instead said the victim was seen with relator between 48 and 72 hours before his death. Excising the misstatement, the trial court concluded the remaining allegations in the affidavit were sufficient to support a finding of probable cause. Regarding relator's claim that the "search warrant" should be suppressed, the trial court found no support for relator's allegations because the palm prints were not taken illegally.
Probable cause for an arrest exists when the facts and circumstances known to the police and of which the police have reasonably trustworthy information are sufficient to justify a person of average caution in the belief that the person to be arrested has committed a crime. The fact that a better showing of probable cause could be made by the affiant does not detract from the showing of probable cause that is made. Minor inaccuracies in assertions in the affidavit may not affect the validity of the warrant. However, if intentional misrepresentations designed to deceive the issuing magistrate are made by the affiant seeking to obtain the warrant, the warrant must be quashed. Alternatively, if unintentional misstatements are included, these misstatements must be excised and the remainder used to determine if probable cause for the issuance of a warrant is set forth. Similarly, when the affiant omits material facts without an intent to deceive, the reviewing court must add the omitted facts to those originally included and retest the sufficiency of the showing of probable cause. State v. Williams, 448 So.2d 659, 662-63 (La.1984). The term "intentional" means a deliberate act made for the purpose of deceiving the magistrate. State v. Rey, 351 So.2d 489, 492 n. 1 (La.1977).
The same body of law applies to search warrants. The making of material and intentional misrepresentations to a magistrate in an effort to secure a search warrant involves a fraud upon the court and results in the invalidation of the warrant and suppression of the items seized. If the misrepresentations or omissions are inadvertent or negligent, the warrant should be retested for probable cause after supplying that which had been omitted or striking that which had been misrepresented. State v. Byrd, 568 So.2d 554, 559 (La.1990).
In the instant case, the allegation in the arrest warrant affidavit that "the victim was last seen with the defendant prior to the stabbing" is inaccurate and misleading, and the related statement in the search warrant is similarly misleading, although to a lesser extent. Lockett admitted in his testimony that Gerald Lane, not relator, was the last person detectives located who was known to have spoken to the victim prior to his death. When asked where he got information for the affidavit that relator was the last person seen with the victim prior to the stabbing, Lockett explained that he received information from the family that the victim had been hanging out with an unknown man named "Rob," he received information from Lane that the victim was seen just prior to the murder getting into a particular vehicle, he received a report from Williams containing the license number for the same type of vehicle and that license number matched to relator's vehicle, and he showed a photographic *794 display to some of the victim's friends and they thought relator's picture looked like the man the victim had been seen with.
Lockett admitted that, when Gerald Lane spoke to the victim, the victim was alone and that was actually the last report of anyone seeing the victim alive. Lane testified at the hearing that he saw the victim get into the driver's side of the vehicle. When the car passed, he did not see anybody else in the car. Lane was not asked if he provided that information to the officer. Lockett testified that he did not ask Lane if the victim got into the driver's seat or the passenger seat, and Lane did not tell him if the victim was alone in the car or if someone else was in the car.
When asked to reconcile the allegation in the affidavit with the evidence, Lockett said,
Well, we got a dead guy there. We find out it's just him that lives there. So then we say, well, he gets killed in his house. Who does hewho has access to be in his house with him? So we go there and we start asking, you know, his family and friends, "Okay, well, who he's been hanging with?" You know, and everybody keeps saying he's hanging with this white dude. And then we find that the white dude is Robert Peterson. And we found outI forgot the ladies' namethe ones we showed the photo lineup to. And they more or less helped to confirm that that was Robert Peterson, the guy who he's been hanging with.
Lockett agreed he should have said in the affidavit that the victim was "last seen hanging" with relator instead of "last seen with Robert Peterson." He said the language used in the affidavit implied that the victim was seen with the relator shortly before his death, but "hanging with" would not have implied that the victim was seen with relator so close to the time of the murder. Lockett said he did not intend to deceive anyone when he drafted the warrant. He admitted the people who saw the victim with relator saw them together two days before the murder.
Under these circumstances, the trial court did not err when it denied the motions to suppress based on allegations in the affidavits. There is no indication Lockett intended to deceive the judge who signed the warrants. He knew the victim had been seen with relator, and he knew the victim was seen getting into relator's car shortly before the murder. Excising the misleading portion of the affidavits, probable cause for issuance of the warrants still exists.
Accordingly, there being no error in the trial court's denial of the motions to suppress evidence, the writ of certiorari is recalled, and defendant's writ application is denied.
WRIT OF CERTIORARI RECALLED; WRIT APPLICATION DENIED.