**Nickson JOSEPH, Plaintiff,**

v.

**Kenneth KIMPLE, et al., Defendants.**

**No. 403CV076.**

United States District Court,
S.D. Georgia,
Savannah Division.

May 10, 2004.

---

Randall A. Schmidt, Savannah, GA, for Plaintiff.

Terry L. Readdick, Whelchel, Brown, Readdick & Bumgartner, Brunswick, GA, Paul Hughes Threlkeld, Oliver, Maner & Gray, LLP, Savannah, GA, for Defendant.

### ORDER

EDENFIELD, District Judge.

## I. INTRODUCTION

Nickson Joseph brings this 42 U.S.C. § 1983 action, alleging that Multi–District Agency Crack Enforcement Drug Task Force (MACE)[1] officer Kenneth Kimple arrested him based on a deficient arrest warrant. MACE, he also says, violated his First and Fourth Amendment rights by executing a search warrant against him after he complained and sought government records on his arrest. Doc. # 1. He thus sues Kimple and all MACE municipal participants.

Over Joseph's opposition, Kimple and MACE participants Liberty County, Long County and Hinesville, Georgia, move for summary judgment. Doc. # 21, 34, 38. Kimple contends, *inter alia*, that he is qualifiedly immune from suit. Doc. # 39 at 14. The municipal defendants insist they cannot be held liable merely because of their MACE participation. *Id.* at 15–22; # 24 at 3–4; # 31; # 50 ¶ 9. And Kimple, they maintain, did not act pursuant to any custom or policy attributable to them, nor lack of training (the two theories on which municipal liability is typically affixed). Defendants also have filed a motion *in limine* on matters here not relevant. Doc. # 49.

## II. BACKGROUND[2]

On 10/6/99, Hinesville police officer Scott Hensler detained Daphne Henry in a rental vehicle inside a mobile home park. Doc. # 59 exh. 3 at 1–3. Hensler arrested her after he observed her chewing a plastic bag, which he believed to contain cocaine. Doc. # 39 exh. A, sub-exh. 2 at 2. A search of the rental car turned up cocaine. Doc. # 50 ¶¶ 9–11.

In fact, 12/20/99 and 3/6/00 Georgia Bureau of Investigation (GBI) lab reports confirm that over 250 grams of cocaine were recovered. Doc. # 39 exh. A (Cato Aff.) ¶ 9 & sub-exh. 6. Defendants fail to provide, however, explanations for the lab's technical terminology (the 3/6/00 lab report, for example, lists 233.6 and 219.5 grams of cocaine samples but notes "Quantitation" of 22% and 68% respectively; does "quantitation" bespeak purity levels?). A small plastic bag of what later tested positive for marijuana (2.1 grams) was also found, in addition to $810 in cash and pornographic photos. Doc. # 39 exh. A, sub-exh. 3 at 4–5.

The vehicle was rented (the Court is not told to whom) and documents in it belonged to Joseph, her boyfriend. Doc. # 50 ¶¶ 5–6. In a recorded sworn statement, doc. # 59 at 43, Henry told Kimple that the cocaine belonged to Joseph. Doc. # 50 ¶ 7. Kimple then successfully sought an arrest warrant from a magistrate, who found probable cause. *Id.* ¶ 8.

In his warrant application, Kimple claimed that on 10/6/99, at the trailer lot (not identified on the warrant as such but

---

**1.** MACE is an inter-agency drug task force based in Hinesville, Georgia. Doc. # 50 ("Attachment 'A' Stipulations") ¶ 12. Hereafter, reference to "doc. # 50" shall mean these Stipulations, unless otherwise indicated.

**2.** This Court will apply the summary judgment standards set forth in *Carlton v. Wal–Mart Stores, Inc.*, 234 F.Supp.2d 1358, 1360 (S.D.Ga.2002).

known to police as the place where Joseph and Henry had been staying), Joseph "*did* unlawfully *possess* 28 grams or more of a controlled substance, to wit: cocaine, in violation of the Georgia Controlled Substance Act." Doc. # 39 exh. A., sub-exh. 7 (emphasis added).[3]

But Kimple had not first obtained crime lab results on the cocaine, though it (months later, as noted above) did later test positive as cocaine. Doc. # 50 ¶¶ 11, 13. And Joseph swears that he was not even in the State of Georgia on 10/6/99. Doc. # 51 (attached Joseph Aff. ¶ 3). What more Kimple told the magistrate cannot be independently corroborated because Kimple did not keep notes, nor can defendants produce any record of his presentation.[4]

Kimple does recall bringing his case file to the magistrate, then being placed under oath and answering the magistrate's questions. Doc. # 59 at 18–20; *id.* at 19 ("On this case we talked about it to the extent where [the magistrate] felt comfortable with issuing the warrant"). He also recalls that the drugs found in the vehicle with Henry were field tested that morning, but he did not testify what the results were. Doc. # 59 at 43–44. His understanding is that a minimum quantity and purity of cocaine are needed to support a trafficking charge. *Id.* at 20.

Pursuant to the 10/8/99 warrant, the police arrested Joseph on 11/10/99. He was initially denied bond until after he retained counsel and successfully petitioned a superior court judge to set it. Doc. # 1 ¶¶ 18–21; doc. # 50 ¶¶ 16–18; *see also* doc.# 59

at 16–17. At subsequent trial, the charge was dismissed for lack of evidence. Doc. # 1 ¶ 23; # 50 ¶ 21.

Plaintiff thereafter filed a Georgia Open Records Act (ORA), OCGA § 50–18–70 *et seq.*, request for records about his arrest. Doc. # 1 ¶ 24. He also provided notice of a claim he wished to bring under the Georgia Tort Claims Act (GTCA), O.C.G.A. § 50–21–20, *et seq.*, against each MACE participating entity. *Id.*; doc. # 50 ¶ 22.

Rather than fully investigate the matter, Joseph alleges, MACE retaliated by procuring a warrant for the search of Joseph's residence. Doc. # 1 ¶ 25. Plaintiff believes that that warrant was not supported by the probable cause required by the Fourth Amendment. *Id.* ¶ 26. The search yielded no fruit. *Id.* ¶ 27; *see also* doc. # 50 at 7 (asserting that "police officers attempted to frame him").

Both in his Complaint and at the 4/27/04 pretrial conference in this case, however, Joseph (through counsel) was vague (due to government record-keeping deficiencies, he claims) about when that search occurred; defendants insisted that if it was a 2003 search then those behind it were oblivious to the ORA/GTCA request/claim, so plaintiff therefore cannot establish a retaliation claim.

In any event, Joseph alleges First and Fourth Amendment violations which have caused him to suffer humiliation and "mental and emotional anguish." Doc. # 1 ¶¶ 28–29. He thus demands a judgment for compensatory and special damages, plus attorney fees/costs. *Id.* (Prayer).

---

3. 28 Grams fetches a "trafficking" grade conviction and sentence. *Clark v. State*, 266 Ga. App. 334, 596 S.E.2d 783 (2004) ("OCGA § 16–13–31(a)(1) defines the crime of trafficking in cocaine as knowingly possessing '28 grams or more of cocaine or of any mixture with a purity of 10 percent or more of co-

caine....' "); *U.S. v. Madera–Madera*, 333 F.3d 1228, 1233 (11th Cir.2003).

4. At that time it was police practice to make a record of such oral testimony. Doc. # 58 at 28.

## III. ANALYSIS

### A. Statute of Limitations

Defendants contend that to the extent Joseph brings any claims based on his 11/10/99 arrest, they are time-barred. Doc. # 39 at 22–23; # 24 at 4–5. There is no disagreement that § 1983 "claims have a two-year statute of limitations. *See Williams v. City of Atlanta*, 794 F.2d 624, 626 (11th Cir.1986)." *Seegars v. Adcox*, 258 F.Supp.2d 1370, 1375 (S.D.Ga.2002). Doc. # 30 at 6–7.[5] But plaintiff, who filed this case on 4/23/03, doc. # 1 at 1, insists that the two-year clock did not begin to tick until a judge dismissed the prosecution (stemming from that search) on 4/24/01. *Id.* & exh. 2 (state court criminal trial transcript).

"Federal law determines when a § 1983 claim has accrued, and the federal rule is that a claim accrues when the plaintiff knows or should have known that his constitutional rights have been violated." *Holly v. Anton*, 97 Fed.Appx. 39, 39–40,

2004 WL 179220 at *1 (7th Cir.1/22/04) (unpublished) (cite omitted); 2 Civ. Actions Against State & Loc. Gov't § 12:40 (Feb. 2004).

■ But where a § 1983 claim for an alleged Fourth Amendment violation is based on an arrest that is made as part of a prosecution, it does not accrue until that prosecution terminates in the plaintiff's favor. *Whiting v. Traylor*, 85 F.3d 581, 585–86 (11th Cir.1996).[6] Joseph brought this action on 4/23/03. Doc. # 1. Two years from 4/24/01 is 730 days (365 × 2), which means plaintiff had until 4/24/03 within which to file this case.[7]

### B. Qualified Immunity

Kimple invokes the qualified immunity doctrine, which generally shields police from suit over actions they take while performing their duties in good faith. The immunity is lost

---

5. Those who violate S.D.Ga.Loc.R 10.1's pagination command needlessly burden this Court. *See* doc. # 30; # 57 (plaintiff's briefs). The Court has manually paginated them so that it can pin cite to pages within same. Counsel is instructed to train himself and/or his staff to use his word processor's pagination feature.

6. *See also Wiley v. City of Chicago*, 361 F.3d 994, 996 (7th Cir.2004) (illuminating permutations on this rule); *Snodderly v. R.U.F.F. Drug Enforcement Task Force*, 239 F.3d 892, 900 (7th Cir.2001) (Civil rights claims against police officers arising from false arrest pursuant to arrest warrant were akin to malicious prosecution claims because they involved legal process, and thus claims did not accrue until criminal prosecution was dismissed; arrestee's claims therefore were timely under Indiana's two-year limitations period for personal injury actions when commenced within two years of dismissal of prosecution, even though they were not commenced within two years of officers' acts).

7. Note that

[m]any courts interpret "year" to mean a calendar year in the absence of specific language indicating otherwise. *Yokley v. Belaski*, 982 F.2d 423, 424 (10th Cir.1992) (term "year" for purposes of sentencing refers to calendar year); *Ward v. Insurance Co. of North America*, 253 Va. 232, 482 S.E.2d 795, 796 (Va.1997) (requiring courts to employ calendar years when computing expiration of statute of limitations); *Georgia R.R. & Banking Co. v. Thigpen*, 113 Ga.App. 65, 65, 147 S.E.2d 346 (1966) (same). The calendar year is routinely defined as the period of 12 months between January 1 and December 31, inclusive."

*Housley v. U.S.*, 1998 WL 668115 at * 1 (M.D.Fla.9/21/98) (unpublished). Virginia courts, then, "must utilize calendar years and not '365–day periods' when computing whether a statute of limitations has expired." *Ward*, 482 S.E.2d at 797. Here, 729 days elapsed between the State court dismissal and the filing of this action. No one argues the "calendar year" approach, much less whether any leap year was involved, nor what difference it would make, so any such argument here is waived.

if an officer's conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Wilson v. Layne,* 526 U.S. 603, 614, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999) (*quoting Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)).... [Courts first] decide "whether a constitutional right would have been violated on the facts alleged...." *Saucier v. Katz,* 533 U.S. 194, 200, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). .... [If the Court believes] that a constitutional violation did occur, [it] must consider whether the right was "clearly established." *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151; *see Groh v. Ramirez,* 540 U.S. ——[551], 124 S.Ct. 1284, 157 L.Ed.2d 1068 [(2004)].

*Doe v. Groody,* 361 F.3d 232, 237–38 (3rd Cir.2004).

Joseph therefore can pierce Kimple's qualified immunity defense by showing that the law was clearly established yet Kimple violated it. He can do so "by (1) pointing to a materially similar case that has already decided that what the police officer was doing was unlawful; or (2) demonstrating that the words of the pertinent federal statute or federal constitutional provision ... are specific enough to establish clearly the law applicable to particular conduct and circumstances and to overcome qualified immunity, even in the total absence of case law." *Storck v. City of Coral Springs,* 354 F.3d 1307, 1317 (11th Cir.2003) (quotes, cites and alterations omitted).

### C. Fourth Amendment

Joseph first contends that Kimple violated his Fourth Amendment rights when he "alleged in a conclusory affidavit that [Joseph] violated [O.C.G.A. §] 16–13–31, trafficking in cocaine, by possessing 28 grams or more of [cocaine at the same location where Henry was arrested]." Doc. # 1 ¶ 10. Kimple, he says, relied only on that affidavit when he requested an arrest warrant from a State court magistrate. *Id.* ¶ 11.

While Joseph agrees that the affidavit complied with O.C.G.A. § 17–4–45 (a "form" statute),[8] he argues that it nevertheless violated the Fourth Amendment. *Id.* ¶ 12. Again, it is undisputed that when Kimple obtained the warrant for Joseph, the cocaine had not yet been tested for purity. *Id.* ¶ 14; doc. # 50 ¶¶ 11, 13.

As of 10/8/99 (the day Kimple swore the warrant out), it was clearly established law that a police officer would *not* be protected by qualified immunity if he applied for an arrest warrant where "a reasonably well-trained officer ... would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant." *Garmon v. Lumpkin County, Georgia,* 878 F.2d 1406, 1410 (11th Cir.1989); *see also id.* at 1410–11 (County sheriff was not entitled to qualified immunity where he directed an investigator to submit a warrant application that con-

---

8. That statutes states that
   [a]n affidavit for an arrest warrant substantially complying with the following form shall in all cases be sufficient:
   Personally came (name of affiant), who on oath says that, to the best of his knowledge and belief, (name of person against whom the warrant is sought) did, on the ——, day of ——, in the county aforesaid, commit the offense of (insert here all information de-

scribing offense as required by Code Section 17–4–41) and this affiant makes this affidavit that a warrant may issue for his arrest.
   [affiant and judicial officer signatures]
   Of course, a statute cannot be self-validating in the constitutional sense, so the Court construes it as speaking of what is "sufficient" in terms of what a *form* affidavit should look like (not its *constitutional* sufficiency).

tained knowingly false statements); *Pickens v. Hollowell,* 59 F.3d 1203, 1206 (11th Cir.1995).

■ Hence, police who knowingly or recklessly use false or materially misleading statements to support a warrant or probable cause showing lose immunity from suit. *Garmon,* 878 F.2d at 1410–11; *Kelly v. Curtis,* 21 F.3d 1544, 1554 (11th Cir.1994) ("a police officer violates the Constitution if, in order to obtain a warrant, she perjures herself or testifies in reckless disregard of the truth"). And a subsequent indictment does *not* absolve the officer from liability for an initial false arrest made without any arguable probable cause. *Jones v. Cannon,* 174 F.3d 1271, 1285 (11th Cir.1999); *cf. State v. Peterson,* 868 So.2d 786, 793 (La.App. 1st Cir.2003) ("if intentional misrepresentations designed to deceive the issuing magistrate are made by the affiant seeking to obtain the warrant, the warrant must be quashed").

The Eleventh Circuit recently reaffirmed this precedent in *Holmes v. Kucynda,* 321 F.3d 1069, 1083–84 (11th Cir.2003) (Police officer may be held liable under § 1983 for submitting application for arrest warrant that contains false information, in violation of the Fourth Amendment; if a reasonable police officer would have known that his testimony in a warrant application was not just negligently false, but recklessly so, then he is not entitled to qualified immunity from claim that officer violated Fourth Amendment); *see also Groh,* 124 S.Ct. at 1294 (Warrant may be so facially deficient that executing officers cannot reasonably presume it to be valid).

■ Relatedly, the Fourth Amendment does not protect against an individual witness who lies about her past personal recollections to investigators who rely upon same in searching and seizing something.

*Mueller v. Gallina,* 311 F.Supp.2d 606, 610 (E.D.Mich.2004).

■ And police can claim "arguable" probable cause, *i.e.,* that a reasonable officer in the same circumstance and possessing the same knowledge as the defendant could have believed that probable cause existed to search and/or arrest the plaintiff. *Durruthy v. Pastor,* 351 F.3d 1080, 1089 (11th Cir.2003) (Officers who make an arrest without probable cause are nevertheless entitled to qualified immunity from civil rights liability if there was arguable probable cause for arrest, *i.e.,* if officer reasonably could have believed that probable cause existed in light of the information that officer possessed).

■ "Arguable" also means that good-faith (hence, honest, non-obvious) mistakes contained in, and minor omissions from, arrest/search warrants will not be sufficient to pierce qualified immunity. *Madiwale v. Savaiko,* 117 F.3d 1321, 1324 (11th Cir.1997) (When considering qualified immunity in § 1983 case alleging arrest without probable cause, issue is not probable cause in fact, but arguable probable cause, as actual probable cause is not necessary for arrest to be objectively reasonable; it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and in such cases those officials should not be held personally liable); *id.* at 1327 ("Omissions that are not reckless, but are instead negligent, or insignificant and immaterial, will not invalidate a warrant") (cite omitted).

In contrast, an officer would not be entitled to qualified immunity when "the facts omitted ... were ... so clearly material that every reasonable law officer would have known that their omission would lead to a search in violation of federal law." *Haygood v. Johnson,* 70 F.3d 92, 95 (11th Cir.1995) (Omitted facts from deputy sher-

iff's search warrant application were not so clearly material that every reasonable law officer would have known that their omission would lead to search in violation of federal law, so as to overcome qualified immunity defense, where deputy had been physically present at what looked to be typical drug deal; reasonable officer in deputy's position could have concluded that informant's use of alias, tape recorder problems during drug buy operation, and greater than expected weight of substance purchased were not material). Direct evidence of recklessness is not necessary; it can be inferred from the omission itself if the fact is "clearly critical to a finding of probable cause." *Madiwale*, 117 F.3d at 1327.

No party in this case has focused on whether the arrest warrant application form itself (as opposed to the form plus supporting testimony and/or documentation) must reflect the probable cause assertions on which the warrant-seeking officer (here, Kimple) relies. As discussed above, however, warrantless arrests/searches are routinely upheld where probable cause exists (and that showing obviously need not be written down beforehand) and the probable cause showing is not conclusory or materially misleading (knowingly or recklessly).

■ Indeed, when an affiant omits material facts from an arrest warrant without an intent to deceive, reviewing courts simply "add the omitted facts to those originally included and retest the sufficiency of the showing of probable cause." *Peterson*, 868 So.2d at 793; *Escalera v. Lunn*, 361 F.3d 737, 743–44 (2d Cir.2004) (Under the "corrected affidavits doctrine," used to assess the materiality of alleged misstatements in an arrest warrant application, courts look to the *hypothetical* contents of a *corrected* warrant application to determine whether a proper warrant application, based on existing facts known to the applicant, would still have been sufficient to support arguable probable cause to make the arrest as a matter of law).

It follows that, if Kimple otherwise shows that he supplied probable cause to the magistrate here, he need not show that it is reflected in the arrest-warrant application (or other standard, supporting documentation) itself. And courts cut police officers some additional slack where they in good faith rely on a recognized legal authority to support their decisions. *Kijonka v. Seitzinger*, 363 F.3d 645, 648 (7th Cir.2004) (Police officer was entitled to qualified immunity in arrestee's § 1983 action alleging that officer arrested him for assault without probable cause; officer consulted county prosecutor before making arrest, and thus had reasonable basis for believing that he had probable cause to make arrest).

Finally, a warrant-seeking officer can invoke the collective knowledge of his fellow officers. *Madiwale*, 117 F.3d at 1324 ("Probable cause" to arrest exists if facts and the circumstances within *collective knowledge* of law enforcement officials, of which they had reasonably trustworthy information, are sufficient to a cause person of reasonable caution to believe that offense has been or is being committed); *U.S. v. Miramonted*, 365 F.3d 902, 904 (10th Cir.2004); *U.S. v. Cervine*, 347 F.3d 865, 871 (10th Cir.2003); *U.S. v. Butler*, 74 F.3d 916, 921 (9th Cir.1996) ("collective knowledge of police officers involved in an investigation, even if some of the information known to other officers is not communicated to the arresting officer," can establish probable cause).

■ To back his claim that he had "a mountain of probable cause" (doc. # 39 at 10) when he swore out the 10/8/99 arrest-warrant affidavit, Kimple points to a variety of sources, including police reports and

the 10/7/99 sworn statement (doc. # 13 exh. 1[9]) made to him by Henry, Joseph's own girlfriend (sometimes referenced by her and the police as Joseph's "wife"). Doc. # 50 at 8.

Joseph preliminarily objects—as hearsay—to defendants' citation to police records in support of their summary judgment motion. Doc. # 57 at 2–3. Parts of those records are admissible, while others are not:

> Police reports are often considered on motions for summary judgment. *See Samuel v. Sun Life Assur. Co. of Can.*, 587 F.2d 203, 204 (5th Cir.1979); *Duffey v. Bryant*, 950 F.Supp. 1168, 1171 (M.D.Ga.1997). Under *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 109 S.Ct. 439, 102 L.Ed.2d 445 (1988), factual findings and matters observed by a public official, such as a police officer, contained in public records, such as police reports, can be allowed in as admissible evidence under the public records exception to the hearsay rule. *Beech Aircraft Corp.*, 488 U.S. at 169–170, 109 S.Ct. 439; *see also* FED. R. EVID. § 803(8)(C); *Miller v. Field*, 35 F.3d 1088, 1091 (6th Cir.1994); *Baker v. Elcona Homes Corp.*, 588 F.2d 551, 556 (6th Cir.1978); Russell, J., BANKRUPTCY EVIDENCE MANUAL, § 803.20 at 1051 (2003 Edition). However, statements contained in police reports made by bystanders, witnesses, and other pertinent individuals are not allowed in as admissible evidence under the Federal Rules of Evidence § 805. FED. R. EVID. § 805; *see also Miller*, 35 F.3d at 1091; *Russell, supra.* Hearsay within hearsay

subject to an exception is not admissible. *See id.*

*In re Byrd*, 294 B.R. 808, 811–12 (Bankr. M.D.Ga.2003) (Factual findings and matters observed by a public official, such as police officer, contained in public records, such as police reports, can be admitted under "public records" exception to the hearsay rule).

In that police may rely on hearsay and "confidential sources" to show probable cause, and Joseph does not otherwise specifically challenge the admissibility of Henry's sworn statement here (functionally little different than an affidavit that courts can consider under F.R.Civ.P. 56), the Court will consider it. Henry identified Joseph as a drug dealer:

> Q. Okay. And what was Mr. Joseph's profession?
>
> A. Drug dealer.
>
> Q. Okay. When you say drug dealer, let's be more specific. Tell me exactly what he dealt.
>
> A. Basically crack.
>
> Q. Okay.
>
> A. Coke.

Doc. # 13 at 19.

From 1998–99, she said, Henry and Joseph "made about $100,000" from crack sales. *Id.* at 39. Trips to Miami, Florida, to buy more cocaine occurred "[s]ometimes four times a month" during 1999. *Id.* at 41.

Henry admitted that on 10/5/99, she was inside the rental car in front of a trailer she and Joseph then shared. Doc. # 13 exh. 1 at 2; *see also id.* at 6 (referring to Joseph as "my husband").[10] She and Joseph had fought earlier that day and she'd

---

9. This exhibit is identified as "Sworn Statement Exhibit 1 BS 5/29/03," *see* doc. # 13 exh. 1, and Henry affirmed it under oath. Doc. # 13 at 75; *see also* doc. # 59 exh. 3.

10. Henry explained that she and Joseph were not legally married but they had been telling "everybody that we were legally married," doc. # 13 at 75, so she referenced Joseph at that time as her husband evidently to be consistent. *Id.* at 75–76.

cut her finger open on a beer bottle. *Id.* at 2.

A police officer (Hensler) spotted her, stopped and asked her what was wrong. *Id.* at 4. Henry admitted she had cocaine on her and "panicked," then "tried to swallow it." *Id.* at 4–5. She had "like a thousand dollars and some change" on her and "[p]owder cocaine." *Id.* at 5. She told Hensler that she did not know where it came from. *Id.* at 6. She also admitted to possessing marijuana. *Id.* at 6.

Hensler found cocaine in her car. Asked by Kimple where it came from, Henry said:

> Henry: My husband [*i.e.,* Joseph] had to of (sic) put it in there, *no one has access to the car but he and I.*
>
> Kimple: O.K. and even though he had access to the car *why would you believe that the cocaine in there was his?*
>
> Henry: *That's what he do (sic). No one else has the access and no one if you say there was a large amount no one else would have put it in there.*
>
> Kimple: O.K. when you say that's what he does explain what it is?
>
> Henry: That's what he does for a living.
>
> Kimple: O.K. he sells.
>
> Henry: That's how we live.
>
> Kimple: He sells cocaine?
>
> Henry: Uh huh.

*Id.* at 8 (emphasis added).

Joseph, she explained, bought cocaine "from different places like his . . . uncle, his cousin, that live (sic) in the like Haiti and Bahamas." *Id.* at 9. He had recently bought a "quarter key" (*i.e.,* 250 grams) and had made recent sales. *Id.* She had not seen him since 10/5/99, but affirmed that he had left the cocaine found in the rental car. *Id.* at 10. And, she further explained, Joseph employed others to sell his cocaine in the Hinesville area. *Id.*

Joseph routinely ("every couple weeks") bought cocaine for such resales, though Henry's arrest frightened him into hiding, she said. *Id.* at 11–12. An inventory of the rental vehicle showed that police found not only the aforementioned cocaine, but a substance that appeared to be marijuana, pornographic photos of Joseph with others, a metal strainer/sifter, a glass cooking dish, multiple plastic sandwich bags, a large quantity of cash, and paperwork bearing Joseph's name. Various other documents contained names which MACE believed to be plaintiff's aliases. Doc. # 39 exh. A. ¶ 8; exh. A sub-exh. 4 (post-arrest lab report showing marijuana tested positive).

Based on these findings and Henry's testimony, Kimple says, he "prepared a written affidavit and presented oral testimony to a magistrate judge, who issued a warrant for Mr. Joseph's arrest." Doc. # 50 at 8.

The defendants also rely on 4/99–period miscellaneous investigative information about things like Henry's suicide attempt, how Joseph had claimed that thousands of dollars of his cash had disappeared from the residence in which he and Henry had stayed, etc. Doc. # 39 at 8–10 & exh. A, subexh. 9. For good measure, they reference a Liberty County deputy's obtention of a warrant for Joseph's alleged kidnapping and assault of one "Charles Euler," and note that that warrant was executed on 11/12/99, *while* Joseph was in custody under the 11/10/99 warrant. Doc. # 39 at 5 n. 2.

This 4/99 and "kidnapping" data legally add nothing, except to imply that Joseph is a criminal. Presumably, the defendants pile on this information to propel the conclusion that, because Joseph has violated the law and entangled the police at other times, that factor can compensate for whatever probable-cause deficits inhere

within Kimple's 10/8/99 warrant application. No authority supports that result.

Once that information is boiled off, the police can be said to have known, within their collective knowledge: (a) the car's inventory and Henry's sworn statement that Joseph regularly buys and resells 250 gram-sized quantities of cocaine (thus exceeding the 28–gram minimum to constitute *trafficking*); and (b) Henry's claim that Joseph owned the rental car's "white substance," which they could reasonably believe to be (as was lab-verified, post-arrest) trafficking-quantity cocaine. Did all of that supply sufficient probable cause such that Kimple's arrest-warrant application showing (as hypothetically reconstructed per *Escalera*, since no record of same is now available) was *not* knowingly or recklessly false, misleading, or conclusory?

While this is a reasonably close case, the Court must grant summary judgment to Kimple, and thus the municipal defendants. Even if the Court held that he was required but failed to (a) include all of his probable-cause information on the arrest-warrant application form itself (as opposed to accompany same with oral testimony and any other supporting documentation or tangible evidence); (b) ensure that a record of what he represented to the magistrate be preserved for the long term (including for litigation like this, filed over it *two years* later); and (c) await the above-mentioned lab results; nevertheless, three points support qualified immunity for Kimple:

(1) Henry's sworn statement (which, in turn, supported the objectively reasonable belief that the "white substance" found in the rental car in fact was trafficking grade/quantity cocaine); plus

(2) the absence of clearly established law mandating what the actual arrest-warrant *form*[11] (as opposed to arrest-warrant *showing*) must reflect (and/or directing police to ensure that their sworn testimony before a magistrate be preserved for downwind litigation such as this); plus

(3) the absence of clearly established law mandating that the police should have first waited *months* for lab results on white-powder "chunks" that, under these circumstances (confirmed by the "wife" of a known cocaine dealer to in fact be part of that dealer's regularly replenished cocaine inventory) would lead a reasonable person to conclude were in fact trafficking quality/quantity cocaine.

It was reasonable of Kimple to accept the word of Joseph's own "wife" that the trafficking quantity of what appeared to be cocaine in fact did belong to Joseph, who was reasonably believed to be a trafficking-level drug dealer. It was reasonable for Kimple to believe that the cocaine sent off for lab testing would come back (as it in fact did) positive for cocaine, and of sufficient quantity/purity to sustain the arrest he then sought.

At a minimum, it was *arguably* not *un*reasonable of Kimple to believe these facts, and to present them to the magistrate, *see Caldarola v. Calabrese*, 298 F.3d 156, 162 (2d Cir.2002) ("in situations where an officer may have reasonably but mistakenly concluded that probable cause existed, the officer is nonetheless entitled to qualified immunity"), and, more importantly, he did not violate clearly established law in doing so.

To be sure, police officers like Kimple—misguided by a state statute prescribing a

---

**11.** Kimple relied on a recognized legal authority — a "form statute" that can be read to sanction "bare-essence" descriptions. *See supra* note 9.

form that invites concision, rather than elaboration—should be more meticulous about documenting their probable cause showing (at least in a taped or transcribed statement under oath before the magistrate, which Kimple swears he generated here (but it evidently has been mislaid)). But Joseph has not shown enough to strip Kimble of his qualified immunity here. That, in turn, unfastens the municipal defendants from Joseph's claims.

The Court additionally notes that plaintiff fails to point to any of the traditional factors needed to establish supervisorial liability. *See Willis v. Siegelman,* 307 F.Supp.2d 1236, 1240 (M.D.Ala.2004) (Causal connection between the actions of supervisor and an alleged constitutional deprivation, required for supervisory liability under § 1983, is established when (1) a history of widespread abuse puts the supervisor on notice of the need to correct the alleged deprivation, and he or she fails to do so, (2) a custom or policy results in deliberate indifference to constitutional rights, or (3) by facts which support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so).

Nor does Joseph make a "custom or policy," "inadequate training," or ratification showing. *See Holmes,* 321 F.3d at 1078 (Local government may be held liable under § 1983 when execution of government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts injury; to succeed on § 1983 claim against county in absence of official policy of inadequate police officer training, arrestee had to prove existence of widespread practice that, although not authorized by written law or express municipal policy, was so permanent and well settled as to constitute custom or usage with force of law); *see also Garvie v. City of Fort Walton Beach, Fla.,* 366 F.3d 1186, 1189 (11th Cir.2004) (For a § 1983 claim to be stated against a municipality based on a ratification theory, plaintiff must demonstrate that local government policymakers had an opportunity to review the subordinate's decision and agreed with both the decision and the decision's basis).

Joseph's made not even the most basic showing on any of those grounds (it is undisputed, for example, that Kimple received State-certified peace-officer training, doc. # 59 at 10, 14, 34, something the *Holmes* court expressly noted in turning back a similar county-liability claim there, 321 F.3d at 1078). On plaintiff's Fourth Amendment-based claims, then, all defendants are entitled to summary judgment on these alternative grounds.

## D. First Amendment

Joseph next contends that defendants executed a second search warrant (which turned up no fruit) in retaliation for his post-acquittal exercise of his First Amendment right to both seek government records behind the 10/8/99 arrest warrant and file a Georgia Tort Claims Act claim in response to his arrest and prosecution. Doc. # 1 ¶ 24–29; # 50 at 8–9.

The Eleventh Circuit recognized this cause of action in *Wood v. Kesler,* 323 F.3d 872, 883 (11th Cir.2003), but emphasized that such claim is defeated by the existence of probable cause. *Id.* (citing *Keenan v. Tejeda,* 290 F.3d 252, 260 (5th Cir. 2002)) (Retaliatory criminal *prosecutions* in violation of the First Amendment are actionable, but only if a plaintiff can also prove the common-law elements of malicious prosecution, including the absence of probable cause to prosecute").[12]

Of course, there was no prosecution in conjunction with the second search warrant (identified as "conducted on or about [2/3/03]," doc. # 50 at 8), but Joseph seems to argue that enduring an unconstitutional search is harm enough to support such a claim here. Doc. # 50 at 8–9. He fails to tie it to Kimple, however, and only to MACE, through MACE investigator Tracy Jennings.[13] *Id.* at 8. Because Jennings's affidavit "largely consists of stale information," Joseph insists that this supports a retaliation claim. *Id.* at 8–9.

 In fact, defendants point out, there is no evidence that anyone involved in the complained of search was aware of Joseph's ORA request or GTCA claim. Doc. # 39 at 19. Plaintiff fails to respond to this argument. Doc. # 50; # 54 at 8–9.[14] His claim thus fails for want of linkage between the complained of act and the First–Amendment activity. *Cf. Post v. City of Fort Lauderdale,* 7 F.3d 1552, 1557 (11th Cir.1993) (Qualified immunity protected police officer, building inspector, and fire inspector in individual capacities from claims that they had violated restaurant manager's civil rights by having him prosecuted on obstruction and resistance charges to deter him from filing civil action against city, where defendants had nothing to do with decision to prosecute manager).

## IV. CONCLUSION

Accordingly, defendants' motions for summary judgment (doc. ##121, 34, 38) are ***GRANTED,*** defendants' motion *in limine* (doc. # 49) is ***DENIED*** as moot, and plaintiff's Complaint is ***DISMISSED WITH PREJUDICE.***

12. *See also Willis,* 307 F.Supp.2d at 1240–41 (Demonstrator stated § 1983 claim that capitol police supervisor violated his First Amendment rights, by ordering him to move off of steps, where he was protesting absence of state flag from capitol Christmas tree, to more distant spot, and in arresting him when he did not comply).

13. Ordinarily, "the existence of probable cause to arrest [Joseph] defeats [his] First Amendment claim." *Dahl v. Holley,* 312 F.3d 1228, 1235 (11th Cir.2002).

14. Joseph insists that Jennings used "stale information" on that warrant, and "failed to

note that [Joseph] had been acquitted" with respect to the charges related to the 10/8/99 arrest warrant. Doc. # 57 at 8–9. This, however, does not negate defendants' showing that no one involved with the 2003 warrant was aware of plaintiff's ORA/GTCA communications. Nor does referring the Court to a 1/3/02 search warrant (doc. # 57 at exh. L) show anything (he sent his ORA/GTCA letters *after* that date, *see* doc. # 57 exh. K; doc. # 30 exh. C), much less Liberty County's poor record-keeping (with respect to search warrants) practices. Doc. # 57 at 8.